OTTO LAACKMANN, Appellant, v. JOHN H. GLASSHOFF et al., Appellees.

REFORMATION OF INSTRUMENTS: Grounds—Non-Mutual Mistake of Law. Reformation of an instrument may not be had on the naked showing that plaintiff, while agreeing to the plain language of the contract as written, did not—unknown to the other party—*understand its effect.*

**APPEAL AND ERROR:** Affirmance—Equity Cause—Avoidance of Forfeiture. On affirmance of an equity cause wherein reformation was refused, the court will, in a proper case, fix a new date for performance by plaintiff, in order to avoid a forfeiture of the contract.

*Appeal from Lyon District Court.*—GEO. J. JEPSON, Judge.

OCTOBER 25, 1917.

REHEARING DENIED FEBRUARY 13, 1918.

SUIT in equity to reform a written contract on the ground of mutual mistake. There was a trial to the court, and a decree dismissing the petition. Plaintiff appeals.— *Affirmed.*

*S. D. Riniker,* for appellant.

*E. C. Roach,* for appellees.

EVANS, J.—I. The contract in question
1. REFORMATION OF INSTRUMENTS: grounds: nonmutual mistake of law. was one for the sale of real estate on long time. The written contract was entered into on May 17, 1915, and was drawn to bear interest from such date on deferred payments at five per cent. This subject-matter of the contract was a farm of 160 acres, sold at $185 per acre, making a total consideration of $29,600. Of this consideration, $1,000 was paid on the date of the contract. The deferred payments were provided for in the contract as follows: "$2,000 on the first day of March, 1916; $2,000 on the first day of March, 1921; $3,000 on the first day of March, 1926; $21,600 on the first day of March, 1931. With interest from this date at the rate of 5% per annum on all such sums as shall remain unpaid, payable annually until all is paid on the 17th day of May each year."

The foregoing quotation from the contract includes the alleged mistake, the claim being that the deferred pay-

ments should not draw interest from the date of the contract, but from March first following. The plaintiff was a tenant upon the farm at the time of the alleged contract, and his lease thereof expired on March first following. The argument on behalf of plaintiff is a very natural one: namely, that, inasmuch as the defendant got the benefit of the possession of the real estate for the year 1915, the interest should not be computed until such possessory right had terminated. It is a matter of quite general knowledge that land contracts in this state do quite generally provide for a settlement as of March first following. If the case before us were one of conflict of the direct testimony of the parties in interest as witnesses, we should lean quite naturally to the contention of the plaintiff as being the more reasonable, in the light of usual custom in such cases. The difficulty with the plaintiff's case is that his own testimony, as a witness, does not materially contradict that of the defendant as to the oral negotiations preceding the signing of the written contract. The utmost denial which the plaintiff makes is that the date from which interest should run was not discussed at all. He admits, however, that, at the time the contract was being drawn by the scrivener, the subject was discussed, and that the written contract was drawn in accordance therewith. The oral negotiations between the parties were testified to by the plaintiff, on direct examination, as follows:

"Q. What was said about the price of the land? A. He wanted $185. Q. And you agreed that you would give him that? A. I told him 'That is pretty near right in price,—it ain't too much.' And he gave me 15 years' time, with 5-year payments from 1916 until 1931, payments every 5 years. Q. What did you say to that? A. I said I would, rather have it paid any old time, if I have the money. Q. You wanted a chance to pay the money any time you had it? A. Yes. He makes a certain amount I

should pay him down every 5 years. I wanted it that way I could pay it more or less, just the way I had it. Q. What did he say? A. No, he won't do it. Q. Then what did you agree on about that,—what did you decide to do then? A. I said, 'All right, I will make it that way, like you want it.' Q. Then what was said about interest,—how much interest were you to pay? A. He wants 5 per cent, and that was a little too much for me. Q. You told him that, did you? A. Yes. Q. Was anything said about when interest was to begin to run? A. Not exactly, —just the year. Q. Nothing was said about the year interest was to start? A. No. Q. Then was anything said further there at that time about what you would do? A. He wouldn't give me no deed with the land. Q. Did you talk about when the deed was to be given? A. After 5 years. Q. Did you agree to pay that much interest, or what did you say about interest? A. I told him it was pretty near too much: it run it awful high. Q. You didn't say you wouldn't give him that much? A. Not then. Q. What did he say then? A. 'I give you time to think it over,' he said. Q. What was the arrangement you made, or what did you do about thinking it over,—did you think it over? A. Yes, I did. Q. When did you see him again? A. That Saturday night; that was the 15th of May. Q. Here in Rock Rapids? A. Yes. Q. Where did you see him when you came to town here,—at his home? A. Yes, I went up to his house. Q. What talk did you have with him there about buying the land; what did you say and what did he say? A. I told him I would take it that way that Mr. Glasshoff said: I would give him 5 per cent. Q. Then was there anything said after that about when that interest was to start to run? A. No; he didn't set no date. Q. There wasn't anything said? A. Not the date. Q. When was that talked about between you and him—when you was to begin to pay interest? A. That

was on the farm he told me. Q. The first time? A. Fifteen years' time, with interest, and I want you to pay the taxes, too, for them fifteen years. Q. When was the interest to begin to run,—when were you to begin to pay interest? A. We didn't put no date down. Q. When was it talked over with him about the interest,—what date the interest was to be paid? A. In Mr. Roach's office. Q. So there was nothing said about when the interest was to start to run until you went to Mr. Roach's office to draw the contract,—is that right? Was that the first that was said about when the interest was to start—in Roach's office? A. About the date, yes. Q. Tell the court what was said about the date it was to start, there in the office,— what was said between you and Glasshoff about that? A. Mr. Roach asked if we had set a date already. Q. The date for the interest to run? A. Yes, he set a date,—I don't remember now. Q. What language did you and Mr. Glasshoff talk in there at Mr. Roach's office? A. We talked mostly German. Q. Who told Mr. Roach what to put in the contract,—you or Mr. Glasshoff? A. Mr. Glasshoff told him. Q. You and Mr. Glasshoff talked together in German? A. Yes. Q. What date did you say the interest was to start? A. Mr. Glasshoff said, 'How does this day, the 17th day of May, suit you for interest day? Q. What did you say? A. I said, 'It suits me all right.' Q. What else was said about the date? A. Mr. Roach said, 'I can't put it down that way; I want you to make it what date to start it.' Q. Mr. Roach said he had to know what date the interest started? A. Yes. Q. Then what was said by you, or what was said by Glasshoff? A. We started on the 17th day of May. Q. What year? A. We said this date,—that is what I didn't understand. Q. You thought it was the 17th day of May in 1916? A. Yes. Q. You didn't know it was to be the year 1915? A. No, I didn't know that. Q. You thought it was the 17th of May, 1916?

A. Yes. When he was out on the farm, he told me he wanted to sell me that place on 15 years' time, and this time, 'I want you to. pay interest, and I want you to pay the taxes, too.' Q. How long did he say it was to run? A. Fifteen years. Q. Until nineteen what? A. 1931. Q. You figured 15 years to 1931 would begin the 17th of May, 1916,—is that the way you figured it? (The defendants object as leading.) A. Yes, that is the way I figured it. Q. So you figured 15 years to 1931 would start ·the interest in 1916? A. Yes. Q. Was anything said between you and Glasshoff, out .there on the farm, about interest beginning to run right away, or anything of that kind? (The defendants object as leading.) A. I asked him about the rent, and then he said, 'Well, I will sell you this place for $185, but I want my rent;' and I said, 'I give you the rent, but that is all.' Q. Was anything said about paying both interest and rent? A. No, there was nothing said about both. Q. Did you say anything about it, that you didn't want to do that? A. No, there was nothing said about that. Q. ·You said you would give him the rent, but that was all you would give him? A. Yes. Q. How did you come to say that,—was he asking for interest too? A. No, he didn't ask for interest."

On cross-examination, he testified further:

"Q. Did you say at what date the contract would draw interest from,—did you say that? A. It was said what year. Q. Did it say what date in the year,—that is the talk you had,—did you say what date in the year it would begin to draw interest? A. Not the date, just the year. Q. When you drew this contract, it was read over carefully, wasn't it? A. Yes. Q. It was all read over by me? A. Yes. Q. That is true: the whole contract was read over? A. Yes. Q. Didn't you say you understood it? A. I don't think I did,—I couldn't say; Mr. Glasshoff told me something about what was in there what

printed. Q. Didn't he ask you, when it was all read over,—didn't he say, 'Do you understand it now?' A. He said, 'Is it all right?' Q. Didn't he ask you if you understood the contract? A. No; he asked me whether it was right. Q. He asked if it was all right? A. Yes. Q. And you said, 'Yes?' A. I said, 'I believe that is right.' Q. You knew the contract said, 'This contract made this 17th day of May, 1915,'—you understood that meant the day you was making the contract? A. Yes. Q. And when it went on to state the date you was to make the payments, you understood all that? A. I got mixed up in that. Q. Now then, it said you was to pay $2,000 on the first of March, 1916, and $2,000 on the first of March, 1921, and $3,000 on the first of March, 1926, and $21,600 on the first of March, 1931,—you understood all that, didn't you? A. It was said different. Q. What? A. This payment. Q. Which payment? A. It was said $1,000 he pays me down, and $2,000 he pays me on the first day of March. Q. 1916? A. Yes. Q. Now then, when the contract is dated the 17th day of May, and states when you are to make payments, and says, 'With interest from this date,'—didn't you understand this date to mean the date of the contract? A. That is what I didn't understand. Q. Why didn't you,—you didn't understand what 'from this date' meant? A. I didn't catch on to it that way. Q. Don't you know now that is what it means? A. Yes, I know it now."

The utmost that can be said for the foregoing testimony is that, though the plaintiff orally agreed to the very language that was incorporated in the written contract, he did not fully comprehend its import. There is no claim of fraud or artifice, or that the defendant had any reason to believe that the plaintiff did not comprehend the full import of the language of the contract. The mere mistake of the plaintiff, of itself, would not justify a reformation. It would be incumbent upon him to show further

either that the mistake was mutual, or that there was artifice on the part of the defendant, or that the defendant knew of plaintiff's mistake. The utmost effect that could be given to the mistake of plaintiff alone would be to destroy the contract on the ground that the minds of the parties had not met. In such a case, the utmost relief which the plaintiff could obtain would be a rescission of the contract. It appears that the defendant has been willing, at all times since the controversy arose, to make a rescission, and to put the parties *in statu quo.* To reform the contract in accordance with the prayer of the petition would be to force an agreement upon the defendant to which he never assented, as appears from the testimony of both parties. There is nothing of itself unreasonable in the provision complained of. The defendant testified that he expressly stipulated both for his rent and for immediate interest, when he fixed the price of his land. He might naturally have demanded a lower price for his land with such condition than he would have demanded if the accruing of interest were to be postponed to a later date. It is a circumstance of some favor to the defendant that the price named by him was deemed a moderate one by the plaintiff himself. Some stress is laid in appellant's argument upon the circumstance that it had been orally agreed between the parties that the payments should extend over a period of 15 years, as appears from the testimony of both sides. The written contract fixes the time of the last payment as March 1, 1931. It may be conceded that this is a circumstance entitled to consideration, but we see nothing conclusive about it. The fact that the defendant gave somewhat more than 15 years' time is not at all inconsistent with his oral offer of 15 years' time. The defendant took the initiative in the offer of long time, and professed to be liberal and indifferent on that subject.

In any event, the plaintiff's own evi-

2. APPEAL AND ERROR: affirmance: equity cause: avoidance of forfeiture.
dence does not warrant a reformation of the contract, and the holding in that regard of the trial court was proper.

II.   It appears from the record that the defendant has served a notice of forfeiture upon the plaintiff for failure to pay the first year's interest.   A temporary injunction was issued, to restrain the defendant from taking advantage of the forfeiture, pending the litigation.   In the decree entered herein in the trial court, a provision was included allowing the plaintiff a thirty-day period within which to cure his default, without the penalty of forfeiture.   The period thus fixed has expired.   Upon an appropriate motion by the appellant, a new date will be fixed by this court, saving to him the opportunity to comply with the terms of the written contract, and thereby to save a forfeiture by default.   In other respects, the decree of the trial court is—*Affirmed.*

GAYNOR, C. J., LADD and SALINGER, JJ., concur.