## Cartmell, et al. v. Commercial Bank & Trust Co., et al.

(Decided May 20, 1913.)

Appeal from Jefferson Circuit Court
(Chancery Branch, First Division).

1. Banks—Banking Commissioner—Status of.—Under the banking act of 1912, when an insolvent bank is put into the hands of the Banking Commissioner, or is taken charge of by him, for liquidation, the status of the Commissioner is that of a trustee.

2. Statutes—Special Proceedings—Legislative Intent.—Special proceedings prescribed by statute exclude other modes of procedure, if such be the legislative intent as determined from the act.

3. Banks—Receivers—Equity.—The banking act of 1912 having provided an adequate and safe method for the liquidation of insolvent banks, a court of equity is without authority to appoint a receiver therefor, unless the Banking Commissioner fails and refuses to perform the duties imposed upon him by the act.

4. Banks—Banking Commissioner—Equity.—Where it is a question as to whether a bank's affairs are in such condition as to warrant its being closed and its liquidation, the Banking Commission may go into a court of equity and ask the advice of the chancellor.

5. Banks—Banking Commissioner—Insolvency—Capital.—When the Banking Commissioner finds a bank to be in an insolvent condition, it is his duty to take charge at once, no notice to the directors to make good the impairment of its capital, within thirty days, being necessary.

6. Banks—Insolvency—Officers and Directors.—An insolvent bank is placed in the hands of the Banking Commissioner for liquidation, when a majority of its directors individually sign and post on the doors of the bank notice that the bank is in the hands of the Banking Commissioner. Notice to all the members of, and action by, the board of directors as a board is not required.

7. Banks—Banking Commissioner—Agents and Employes of Commissioner.—The president and director of an insolvent bank placed in the hands of the Banking Commissioner may be retained by the Banking Commissioner as his agent in the liquidation of the bank.

8. Banks—Banking Commissioner—Receiver—Expenses.—The fact that the Banking Commissioner, in the liquidation of an insolvent bank, will be subjected to payment of rents, salaries, counsel fees, etc., a review of which expenses by a court of competent jurisdiction is provided for in the banking act, does not authorize the appointment of a receiver.

H. O. WILLIAMS for appellants.

HERMAN NEWCOMB, ARTHUR B. BENSINGER and HINES & NORMAN for appellees.

OPINION OF THE COURT BY JUDGE LASSING—Affirming.

Prior to January 22, 1913, the Commercial Bank & Trust Company, a corporation organized under the laws of Kentucky and empowered to do a general banking and trust business, was located and doing business in the city of Louisville. On that date the capital stock of the bank was impaired to such an extent that a majority of its board of directors deemed it advisable for the bank to cease to do business, and, without notice to all the members of the board, prepared, signed, and posted on the doors of the bank the following notice: "This bank is in the hands of the Banking Commissioner," quit business, and notified Thomas J. Smith, Banking Commissioner of the State, of their action. Thereupon, the Banking Commissioner took charge of all the property and assets of the corporation and proceeded to wind up its affairs. Because of his familiarity with the bank's business, he retained Ben L. Bruner, the president, to assist him in liquidating the bank. Before permiting him to enter upon the discharge of his duties, he required him to execute a good and sufficient bond.

On February 13, 1913, T. R. Cartmell and six others, depositors of the bank at the time it was placed in the hands of the Banking Commissioner, filed suit against the Commercial Bank & Trust Company, Thomas J. Smith, the Banking Commissioner, Ben L. Bruner, his employe styled a Special Deputy Banking Commissioner, and the Fidelity & Columbia Trust Company, in which they sought the appointment of a receiver to take charge of all the property and assets of the insolvent bank and a reference to the court commissioner for a settlement of its affairs. As grounds for their application, the plaintiffs allege:

1. That the Commercial Bank & Trust Company was insolvent.

2. That a majority of the directors had not the power to put the bank into the hands of the Banking Commissioner, without first giving notice to all of the directors of their proposed action.

3. That the Banking Commissioner failed to notify the directors of the impairment of the capital stock of the bank, or to require them to make it good, within thirty days.

4. That Ben L. Bruner, appointed by the Banking Commissioner as his agent to assist him in liquidating the bank, was disqualified to act as such, because of the fact that he was the president and a director of the insolvent bank.

5. That the expenses for office rent, salaries of the Banking Commissioner and his agent, and counsel fees were being incurred.

The motion for a receiver was submitted and heard upon the plaintiffs' pleading and, upon considration, the chancellor was of opinion that plaintiffs had failed to show any legal ground for the appointment of a receiver for said bank and overruled said motion. They appeal.

Banks are to the commercial world what arteries are to the human system. Through them passes the vitalizing, life-giving medium of exchange, and, upon their healthy condition, commercial activity and prosperity in the main, depend. It is a matter of common knowledge that payment, in ninety-five per cent. of all business transactions, is made, not in cash but by means of checks or drafts. Banks thus become, in a sense, public institutions. Though organized and financed by private individuals and for personal gain, they nevertheless serve an almost indispensable public purpose, and upon this ac-

count, in most of the states, legislation has been enacted looking to their regulation, examination, and control.

Prior to 1912, there were few safeguards thrown around banking institutions in this state. The frequency with which bank failures occurred led the Legislature, in 1912, to pass a comprehensive act looking toward the regulation, examination and proper conduct of all State banks, and providing for the closing and winding up of the affairs of all such as were found to be in an insolvent condition. This legislation has, as its ultimate aim the protection of the depositing public, and it is doubtful if any legislation enacted in recent years is calculated to have so beneficial an influence and effect. The power of the Legislature to pass the act is not seriously questioned; nor is it claimed that the provisions thereof are unreasonably or unduly restrictive of the inherent rights, which banks have by reason of their charter provisions. 'Appellants seem to have proceeded upon the idea that the act in question did not give the Banking Commissioner power to summarily close the bank, or authorize the board of directors to place it in the hands of the Banking Commissioner for liquidation, in the way and manner in which it was done in the case at bar. It is also claimed, that, in retaining Ben L. Bruner, in his service in charge of the bank while in process of liquidation, the commissioner not only exceeded his authority but violated an express provision of the act itself. Other grounds are urged in support of the claim that the court should direct the liquidation of the bank, through its receiver, rather than permit it to be carried out under the order and directions of the Banking Commissioner. But, as it is apparent that, if it should be held that the Banking Commissioner has the power, under said act, to close a bank, when found by him to be in an insolvent and failing condition, or, that a majority of the board of directors may, without notice, place the bank in the hands of the Banking Commissioner, when it is found to be in an insolvent condition, and that the Banking Commissioner and a majority of the directors of the bank have proceeded in the way and manner prescribed in the act, it necessarily follows that, in taking the steps which they did, they acted within their rights.

The act, under consideration, is comprehensive and far-reaching in its effect. It is apparent, from an examination of its various provisions, that the Legislature intended that it should be the whole law upon this subject. Section 1 provides: "There is hereby established a de-

partment to be designated "Department of Banking" which shall be charged with the enforcement of all laws heretofore passed, or which may hereafter be passed, relating to banks, trust companies, saving banks, combined banks, and combined banks and trust companies, organized and doing business under the laws of the Commonwealth of Kentucky." This idea permeates the entire act and is accentuated by the language of the closing section, for it is there provided: "All acts and parts of acts in conflict with this act are hereby repealed."

Section 2 creates the office of Banking Commissioner, defines his powers and duties, and fixes his compensation and term of office.

Section 3 provides for the employment of clerks and stenographers for his office, at a total expense not exceeding $2,400 per annum.

Section 4 provides that all reports, which banks had theretofore been required to make to the Secretary of State, should be made to the Banking Commissioner and received by him.

Section 5 provides for the appointment of a deputy banking commissioner, prescribes his duties and fixes his salary, term of office, etc.

Section 6 provides for the appointment of three bank examiners, defines their qualifications and duties and fixes their compensation, etc.

Section 7 provides as follows: "No Banking Commissioner, Deputy Banking Commissioner, or State Bank Examiner, shall be or become indebted, directly or indirectly, either as borrower, indorser, surety or guarantor, to any bank under his supervision, or subject to his examination; nor shall he be a director, officer or employe in any such bank, but no person shall be appointed to examine the affairs of any bank or trust company in any county in which he holds stock in either a State or a National Bank.

"If any officer becomes so indebted to, or so interested in, any such bank, or shall engage or become interested in the sale of securities as a business, or in the negotiation of loans for others, his office shall, *ipso facto*, become vacant. The cashier or president of any bank to which any of said officers shall become indebted, shall make immediate report thereof to the Governor, who shall remove the officer so offending.

"Every Banking Commissioner, Deputy Banking Commissioner and State Bank Examiner shall be a resident and citizen of the Commonwealth of Kentucky, shall

be a practical bookkeeper and accountant and shall have had not less than four years actual experience as officer or clerk in a bank or trust company, and shall take the oath required of officers by the Constitution and the laws of this Commonwealth, for the faithful performance of his duties. They shall severally execute bond with good surety, to be approved by the Auditor, for the faithful performance of their duties. The bond of the Banking Commissioner shall be in the penal sum of fifty thousand dollars ($50,000) ; the bond of the Deputy Banking Commissioner shall be in the penal sum of twenty-five thousand dollars ($25,000) ; the bond of each State Bank Examiner shall be in the penal sum of ten thousand dollars ($10,000). All bonds so required to be executed shall be filed as part of the public records in the office of the Secretary of State. The cost of all contingency and all bonds required to be given under this section, shall be borne and paid by the State in the same manner as other expenses of the Department.''

Section 8 provides for the inspection of banks, and is so worded and drawn as to enable the Department of Banking, through its Commissioner and Examiners, to ascertain, with accuracy, the financial standing of any banking institution upon any given date and to detect irregularities in the conduct of its business.

Section 9 provides for the payment, by the various banks, of the cost of examination, and for the filing of reports made relative to their condition at such time.

Section 10 provides for verified detailed reports of the condition of the banks, which they are required to make when called upon to do so by the Banking Commissioner.

Section 11 provides that these reports shall be received as *prima facie* evidence, in all proceedings in courts of justice where the bank is a party or is interested.

Section 12 provides for the publication and preservation of these reports.

Section 13 provides for the imposition of penalties upon the Banking Commissioner, Deputy Banking Commissioner, and each Bank Examiner, for a failure to discharge the duties imposed upon them by the act.

Section 14 provides for the examination of insolvent banks, when in the hands of a receiver of a court.

Section 15 empowers the Banking Commissioner to require stockholders of a bank to make good, by assessment, any impairment of its capital when, in his judgment, such a course is necessary.

Section 16 authorizes the Banking Commissioner to take charge of a bank, when it is found to be in an unsafe condition, and is as follows:

"If from an examination made as provided in this Act, it shall appear that any bank is insolvent or that its capital stock has become impaired beyond the period allowed by law, it shall be the duty of the Banking Commissioner in person or by his deputy or by a State Bank Examiner immediately to take charge of such bank and all property and effects thereof.

"If an examiner shall find that any bank is pursuing a dangerous and unsafe policy, the Examiner shall call the directors and officers of such institution together and advise them fully of the nature of such objectionable practices, and warn them against a repetition thereof, and shall make a full report to the Banking Commissioner of the practices warned against, and the advice given by him, and thereupon the Banking Commissioner, if he deem it proper, shall, in person or by written notice to each director, require an abandonment or cessation of such objectionable practices or policy, and if his directions are not complied with, he may place a State Bank Examiner in charge of such bank, or he may adopt such other policy as may in his judgment seem wise and best calculated to bring the institution back to a safe condition. The officers, directors or stockholders of any bank shall have the right forthwith, upon his declaring his intention of doing so, to execute to such commissioner a bond with surety or security approved by him, conditioned to secure the creditors of such bank, and upon the execution of such bond the Banking Commissioner shall leave with, or restore the custody and management of such bank to the officers and directors thereof. The Commissioner may, if he deem necessary, cause a petition to be filed in the circuit court of the county where such bank is located, and apply to such court or to the judge thereof when the court is not in session, for the appointment of a receiver of such bank, and thereupon such court or the judge thereof shall set a date for the hearing of the application for the appointment of a receiver, not later than twenty days from the date such motion is made and of which notice shall be served upon the bank. Upon such hearing the parties may be heard by affidavits or upon oral examination in court or before the judge and thereupon the judge shall hear and determine the question of the appointment of such receiver, and if the court shall determine that such action or proposed action of the

commissioner was justified, the court shall appoint a receiver, and shall fix the amount of the bond to be given by him.''

Section 17 provides for the appointment, by the Banking Commissioner, of special deputies, counsel, employes, etc., and fixes the maximum compensation which such appointees may receive, and provides further that the action of the commissioner, in allowing compensation to counsel and employes, shall be subject to review. It also provides for the filing, in the office of the circuit court clerk of the county where the bank is located, verified detailed reports as to the bank's condition, while in process of liquidation, the first of said reports to be filed within thirty days after the commissioner takes charge, and the others at stated intervals thereafter until its affairs are entirely wound up.

Section 18 provides that the directors of a bank, when they find it to be insolvent, may place it in the hands of the commissioner.

Section 19 provides for a public record to be kept in the office of the Banking Commissioner, wherein certain detailed information, relative to the condition of every bank in the State, shall be kept open, at all times, for inspection by the public.

Section 20 provides that no bank may be organized to do business in this State, except with the approval of the Banking Commissioner.

Section 21 provides that the Banking Commissioner shall make a detailed report of the business of his office annually, during the month of June. This report shall show the condition of every bank organized, during the year or prior thereto, and doing business in the State; also a statement of the condition of every bank that had been closed under his supervision or had voluntarily gone out of business during the year; and such amendments to the banking law as, in his judgment, would tend to perfect the same and better secure the interests of the depositors, stockholders and creditors. Lastly, he is required to report the names of all his assistants, clerks and employes, together with the compensation received by each, and a detailed statement of the receipts and expenses of his department, during the current year.

Section 22 provides for a seal of office.

It is thus apparent that the Legislature, after having provided for the appointment of a commissioner, empowered to select a deputy and three bank examiners and a competent office force, has laid down an elaborate

scheme looking toward a rigid examination of banks throughout the Commonwealth. Detailed provision is likewise made for the closing of banks, found to be in an unsafe or insolvent condition, and explicit directions are given as to how their affairs shall be conducted, while in process of liquidation. From the detailed manner in which the Legislature has dealt with the subject, it was undoubtedly intended that the procedure, looking toward the closing of insolvent banks and their liquidation, was to be under the supervision of the Banking Commissioner, and to obviate the necessity of going into a court of chancery to procure the appointment of a receiver, in order to wind up the affairs of insolvent banks. Indeed, there is no necessity for a receiver, when the Banking Commissioner proceeds as directed by the provisions of this act; for, when he takes charge of a bank, all of his acts are such as might properly be discharged by a trustee, or other person, or officer, occupying a fiduciary position. The object and aim of the law, in the appointment of a receiver, is to see that the assets of the institution, in charge of which he is placed, are properly, honestly and economically administered. The ends of the law are satisfied, if the estate is administered in this way, whether the person charged with its administration be termed a banking commissioner, a trustee, or an assignee. The duties are the same. If any difference is to be found, it is in favor of the liquidation of banks, through and under the direction of the banking commissioner rather than under a receiver appointed by the court, for the former plan is not only more expeditious and less cumbersome but is undoubtedly less expensive, and the commissioner, because of his experience and peculiar fitness for the work, is better qualified to attend to the liquidation of a bank than most persons, whose services the chancellor would be able to secure for that purpose.

In all cases where, by legislative enactment, a mode of procedure is prescribed for the doing of an act or accomplishing a particular purpose and the question is raised as to whether or not such mode of procedure is exclusive, it is important to determine, from the act, the legislative intent. When the act under consideration is read with this end in view, it would seem that it was not within the contemplation of the Legislature that another mode of procedure should be adopted or followed, for the act plainly provides that, when a bank is found to be insolvent, the commissioner himself may take charge, with the view of winding up the affairs of the bank, or a ma-

jority of the board of directors may sign and post the notice above referred to and, in this way, place the institution in the hands of the commissioner for liquidation or if, in the judgment of the commissioner, it is a question as to whether or not the bank's affairs are in such condition as would warrant its liquidation, he may go into a court of equity and ask the guidance and direction of the chancellor as to whether or not he should close it. Of course, if the commissioner does not act and the directors refuse to take the initiative, a court of chancery would undoubtedly have the right to appoint a receiver for the preservation of the assets of the bank and the protection of the interests of the creditors, upon a proper showing and request on the part of creditors. But the basis for the action, in a case of this character, would be the failure and refusal of the commissioner to discharge a duty which the act, under consideration, plainly imposes upon him. The act, when properly and fairly construed and administered, affords ample, full and complete protection to all depositors and creditors of a bank, when found to be in an unsafe or insolvent condition; and, as stated, in all cases where the Banking Commissioner should refuse to discharge the duties imposed upon him by the act creditors would have the undoubted right to seek relief in a court of equity. No such condition existed in the case at bar. The commissioner and a majority of the board of directors, when the bank was found to be insolvent, at once placed its assets in the hands of the commissioner as provided by the act; and, at the time of the institution of this suit, the assets were being preserved and collected for the benefit of appellants and all other creditors of the bank. The interests of appellants were as fully, amply, and completely safeguarded and protected as they would have been, were a receiver of court, instead of the Banking Commissioner, discharging these duties. The Banking Commissioner and directors have proceeded in strict conformity with the requirements of the act. It being conceded that the bank was, at that time, insolvent, their acts and proceedings were fully justified.

In assuming control of the insolvent institution, the commissioner was discharging a plain duty imposed upon him, not only by the spirit but by the very letter of the act. There is no merit in the suggestion that the commissioner should not have taken this drastic step, until after the stockholders had been given a reasonable opportunity, upon notice, to make good the impairment of the capital of the bank. The law does not require that the

commissioner shall withhold action until such a step is taken. True, when he finds the capital impaired, he may, if, in his judgment, such a step would place the bank upon a sound business basis, require this to be done; but, where he finds that a bank is insolvent, it is his duty to take charge of it. This is for the protection of the bank's depositors and other creditors. Section 597, Kentucky Statutes, makes it a felony for the officers or directors of a bank to receive deposits after they know it is in an insolvent condition. So, when an examiner has discovered that a bank is insolvent and has acquainted the officers and directors in charge with this fact, if they continue to do business, so far as receiving deposits is concerned, they do so at their peril and render themselves liable to prosecution, even though they acted in perfect good faith in continuing to do business. The provision that a bank should be closed, when found to be insolvent, is, therefore, a protection not only to the creditors of the bank but to the officers and directors as well. It is a wise provision and one that should be adhered to and rigidly enforced, for no banking institution should be permitted to receive deposits when it is found to be in an insolvent condition. The public is entitled to be protected to this extent, and, no doubt, this was the main purpose of the Legislature in providing for an examination and inspection, and, when in this way it was disclosed that the bank was insolvent, for the commissioner to take charge. The commissioner did not direct or attempt to require the stockholders to make good the impairment of the capital and he was under no duty to postpone action. As it is conceded that the institution was insolvent, the wisdom of his course, in taking prompt action for the protection and security of all the bank's creditors, is not open to question.

But, it is insisted that, although the bank was insolvent, the action of a majority of the board of directors, in signing and posting the notice that the bank was in the hands of the Banking Commissioner, was illegal and void. In reaching this conclusion, counsel has confused the provisions of this act with the general rule of law governing proceedings of boards of directors. A corporate board of directors must act as a board in order to bind the corporation, i. e., at a meeting held on the regular meeting days, as provided in the by-laws, or if, upon another date, after notice to all the members of the board of the time of meeting, and when a majority of the board are present, and the evidence of the board's action is the record made at such meetings, signed by the president

and attested by the secretary. But, under the provisions of this act, all that was necessary to be done was that the notice should be signed, in person, and the posting done, by a majority of the board of directors, not acting as a board but in their individual capacity. As it is not denied that a majority of the board of directors did sign the notice, we hold that this provision of the act was literally complied with.

Nor is there merit in the complaint that the commissioner retained·Dr. Ben L. Bruner, the president and also a director of the bank, to assist him in winding up its affairs. Section 17 of the act expressly provides that the Banking Commissioner may employ such counsel, and procure such expert assistants and advice as may be necessary in the liquidation and distribution of the assets of such bank, and may retain such officers or employees of such bank as he may deem necessary. The employment of Dr. Bruner was, under this section of the act, fully authorized, and the commissioner was not prohibited from so employing him by reason of the provisions of section 7 of the act, defining the qualifications of the commissioner, deputy commissioner and examiners. Aside from this, if it should be held that the commissioner had exeeded his authority in employing Dr. Bruner and retaining him during the progress of the liquidation of the bank, it would be no ground for the appointment of a receiver. It would merely be ground for the removal of one whose employment was unauthorized. But, as stated, the act specifically authorized the commissioner to retain in his employ, for the purpose of aiding him in liquidating the bank, such of its officers and employes as, in his judgment, should be retained. The fact that Dr. Bruner was an official of the insolvent bank or that he may be interested in the reorganization of a new bank, cannot, in the face of the plain provisions of the section of the act quoted, militate against the right of the commissioner to employ him. Every interest of the creditors of the insolvent bank has been safeguarded by the commissioner in requiring of said Bruner ample bond to secure the faithful discharge of his duties, while acting for and under the Banking Commissioner.

Lastly, it is complained that the liquidation of the bank in the hands of the commissioner will subject the bank to the payment of costs for rent of building, clerk hire, lawyers' fees, etc. Similar items of costs would necessarily be incurred by a receiver. As the act makes ample provision for a review, by a court of competent

jurisdiction, of all acts of the commissioner in fixing fees and allowances, the interests of creditors are fully protected.

Upon the whole case, we are of opinion that the chancellor correctly held that no ground was presented, upon which his interference with the Banking Commissioner in discharge of his duties, as defined by the act, could be justified. The judgment is therefore affirmed.