[No. 23786. *En Banc.* August 15, 1932.]

*In the Matter of the Liquidation of the* CASHMERE STATE BANK.

THE STATE OF WASHINGTON, *on the Relation of S. M. Sim et al., Plaintiff,* v. THE SUPERIOR COURT FOR CHELAN COUNTY *et al., Respondents.*[1]

[1]Reported in 13 P. (2d) 892.

*J. Harold Anderson,* for appellants and relators.

*Arthur G. Cohen,* for respondents.

*W. S. Gilbert, amicus curiae.*

STEINERT, J.—These cases, consolidated, present two questions for our determination: (1) May the state supervisor of banking, as liquidator of an insolvent bank, make a loan from the Reconstruction Finance Corporation, pledging as security for such loan the assets of the insolvent bank, and use the proceeds of the loan to pay the claims òf preferred creditors and declare a first dividend to depositors and general creditors of the insolvent bank? (2) Has the court the power to approve the making of such loan? The two questions are closely related, and will be considered together in our discussion.

The facts presented by the record and essential to our understanding of the cases are these: On January 30, 1932, C. S. Moody, as supervisor of banking for the state of Washington, made an examination of the condition of the Cashmere State Bank, Cashmere, Washington, determined that it was in an unsafe and unsound condition to do business, and declared it insolvent. On the same day, pursuant to Rem. Comp. Stat., § 3266, and by virtue of his office, he closed the institution, took possession of all the affairs and assets of the bank for the purpose of liquidation, and has ever since continued in possession thereof.

260

On January 21, 1932, the Congress of the United States enacted a law known as the "Reconstruction Finance Corporation Act," § 5 of which reads, in part, as follows:

"To aid in financing agriculture, commerce, and industry, including facilitating the exportation of agricultural and other products the corporation is authorized and empowered to make loans, upon such terms and conditions not inconsistent with this chapter as it may determine, to any bank . . . organized under the laws of any State or the United States, including loans secured by the assets of any bank that is closed, or in process of liquidation to aid in the reorganization or liquidation of such banks, upon application of the receiver or liquidating agent of such bank and any receiver of any national bank is hereby authorized to contract for such loans and to pledge any assets of the bank for securing the same: *Provided,* That not more than $200,000,000 shall be used for the relief of banks that are closed or in process of liquidation." Sec. 605, U. S. Code (Ch. 14, Reconstruction Finance Corporation Act), Title 15.

On March 22, 1932, the state supervisor of banking, in charge of the liquidation of the Cashmere State Bank, filed a petition in the superior court of Chelan county, Washington, wherein the bank is situated, requesting authority to borrow $100,000 from the Reconstruction Finance Corporation and to pledge the assets of the bank as collateral security, in order to enable the state supervisor to pay preferred claims and declare and pay a dividend to general creditors and depositors. On the same day, the court made an order fixing April 4, 1932, as the day of hearing on the petition, and directing the state supervisor to publish notice of such hearing in a newspaper of general circulation in Chelan county and to mail a copy thereof to each creditor, depositor and stockholder. On April 4, 1932, after a hearing on the petition, it appearing

that the required notice had been duly given, the court entered an order granting the prayer of the petitioner. From that order, S. M. Sim, a depositor, and W. D. Stewart, a stockholder, respectively, of the Cashmere State Bank, have appealed to this court.

On April 8, 1932, S. M. Sim and W. D. Stewart, depositor and stockholder, respectively, of said bank, made application to this court for a writ of certiorari. The writ having issued, the record upon which the lower court authorized the state supervisor of banking to borrow the money as requested in said petition is before us for review. The appeal and the proceedings for review have been consolidated by stipulation, and are now before us for consideration and decision.

The facts upon which the application of the state supervisor of banking to borrow money is predicated are these: The Cashmere State Bank has among its assets $100,000 in properties which are of a character either not readily convertible into cash or which consist of securities which in the present abnormally depressed condition of the market it would be flagrantly wasteful, and would involve a sacrifice, to sell at this time. The insolvent bank is the only banking institution in the city of Cashmere and its vicinity. Its closing had an injurious and profoundly depressing effect upon the merchants, farmers, and orchardists of Cashmere and the surrounding country; it deprived them of the facilities for obtaining credit for seed, the planting of crops, and the spraying and pruning of orchards, and seriously affected their ability to conduct the various agricultural and industrial pursuits prevalent in that community.

At the very outset of our discussion, it must be conceded that neither statute nor judicial decision expressly confer authority upon the state supervisor

of banking to borrow money and pledge the assets of the insolvent bank in his custody to pay dividends. It must also be conceded that equity receivers do not, by virtue of their mere appointment as such, possess such powers.

The state supervisor of banking, however, is an executive officer of the state. As such, he acts in a governmental capacity for the public interest.

"The superintendent of banks, in taking charge of the affairs of an insolvent bank for liquidation, is the agent of the State. He acts for and in behalf of the commonwealth. His possession is that of the State, who is his principal." *Bennett v. Green,* 156 Ga. 572, 119 S. E. 620.

While banks are not public corporations, they are quasi-public institutions. 1 Michie on Banks and Banking, chap. 1, § 2, p. 6, and cases cited thereunder. Descriptive of the functions of banks, the supreme court of Kentucky, in *Cartmell v. Commercial Bank & Trust Co.,* 153 Ky. 798, 156 S. W. 1048, said:

"Banks are to the commercial world what arteries are to the human system. Through them passes the vitalizing life-giving medium of exchange, and, upon their healthy condition, commercial activity and prosperity in the main, depend. It is a matter of common knowledge that payment, in ninety-five per cent of all business transactions, is made, not in cash but by means of checks or drafts. Banks thus become, in a sense, public institutions."

The supreme court of Florida, in *Bryan v. Bullock,* 84 Fla. 179, 93 South. 182, said:

"The business of banking is an occupation which bears such an intimate relation to the affairs of man that the proper supervision and control of its affairs and methods of transacting business, the discharge of its functions and obligations, is of great importance, to the end that the peace of the community, the wel-

fare of the people, the orderly functioning of industrial activities and the preservation of faith and confidence in commercial transactions be secured and maintained. A banking company's relation to the community is so intimate and its service of such far reaching and comprehensive scope that it has become a *quasi* public function and almost, if not quite, classed as a public utility.''

By the state banking act, the examiner (whose duties are now performed by the state supervisor of banking), is directed as follows:

''Upon taking possession of any bank or trust company, the examiner shall proceed to collect the assets thereof and to preserve, administer and liquidate the business and assets of such corporation.'' Rem. Comp. Stat., § 3269.

It is true that the state banking act in another portion of the section just quoted, and also in Rem. Comp. Stat., §§ 3273 and 3277, provides for the doing of certain acts by the supervisor with the approval of the court. These include the sale and compromise of bad or doubtful debts, the sale of real and personal property, and the payment of dividends out of the ultimate funds remaining in his hands after the payment of expenses. It is argued that these provisions are restrictive, and by their enumeration exclude all others not specifically designated.

Bearing in mind that the state supervisor of banking is an executive officer of the state, that his duties are of a public nature, and that, in the discharge of them, he acts in the public interest, we are induced to place such construction upon the statute as will enable him to administer speedily, adequately and comprehensively the trust imposed upon him.

In legislating for the performance of a public duty by a state officer, it must be recognized that statutes can not provide for every minute detail of operation.

Specific situations can not always be expressly provided for, nor anticipated with exactitude. The most that can be expected of this character of legislation is a declaration, in general terms, of the purpose for which the office is created and the officer appointed. Capacity coextensive with the nature of the office and the object to be accomplished must be inferred, and the necessary power to function therein implied.

"The administration of government often requires, in a large degree, the exercise of discretion and judgment." *Sheeley v. People,* 54 Colo. 136, 129 Pac. 201.

"The duties of an office include all those that fairly lie within its scope; not merely those which are necessarily involved in the accomplishment of the main purpose of the office, but those also which, although incidental and collateral, naturally and properly serve to promote and benefit the performance of the principal duties. Constitutions and statutes seldom define with precision the scope of any office." *Moore v. Nation,* 80 Kan. 672, 103 Pac. 107, 23 L. R. A. (N. S.) 1115.

Our own court, in the case of *State ex rel. Hartley v. Clausen,* 150 Wash. 20, 272 Pac. 22, said on page 24:

"It is a well-recognized rule of law that, if a board is charged with a specific duty and the means by which the duty is to be accomplished are not specified or provided for, the board so charged has an implied power to use such means as are reasonably necessary to the successful performance of the required duty. In *State ex rel. State Board of Medical Examiners v. Clausen,* 84 Wash. 279, 146 Pac. 630, . . ."

In *State ex rel. Railroad Commission v. Great Northern Railway Company,* 68 Wash. 257, 123 Pac. 8, this court said at page 262:

"The legislature, acting within its constitutional powers, has, by statute, created the railroad commission and entrusted to its jurisdiction the broad and complex field covered by the duties of common carriers in their relation to the public as such. A juris-

diction so vast is of necessity covered in general terms. The dominant purpose of the act is remedial. There is, therefore, conferred by necessary implication every power proper and necessary to the exercise of the powers and duties expressly given and imposed.''

By the banking act, the examiner (supervisor) is required to collect, preserve, administer and liquidate the assets of the bank. The activities indicated by these words present a natural and orderly sequence, and look to the assembling and management of the assets and their distribution among those to whom they properly belong. The ultimate purpose is to conserve the assets, not only for the sake of their existence, but particularly for their ultimate disposition. Whatever, therefore, may be reasonably necessary in order to enable the state supervisor of banking to properly function and finally to effect as great and speedy a return as possible to those entitled thereto, may be said to be included within the preservation and administration of the bank's assets.

What is necessary to preserve and administer such assets, must necessarily be a matter for the state supervisor to determine in the first instance, subject, however, to the approval of the court. Whether the particular purpose will effect, or contribute to, the preservation, and ultimately the proper administration and liquidation, of the assets, will, of course, depend upon the particular facts and circumstances. The power to borrow must necessarily always be exercised with great caution, but this statement carries with it the corollary that, after such caution has been exercised and the circumstances by necessity demand such a course of procedure, the power to execute it exists.

In this case, the assets of the bank are now admittedly ''frozen.'' Neither preferred creditors nor gen-

eral creditors can presently hope to realize anything out of them. It is impossible to dispose of the assets now, or, if it be possible, the consequences at any rate would be disastrous. To hold them in their present form, offers no prospect to either class of creditors or to the stockholders. To accept the beneficent and generous aid proffered by the Reconstruction Finance Corporation, would, at least, immediately realize liquid assets to be paid to preferred creditors and even in part to the general creditors, with no serious, if any, loss or prejudice to the stockholders. So far as the stockholders are concerned, it is merely the substitution of one preferred creditor in the place of another.

If the loan is perfected, the money, borrowed at a low rate of interest, goes immediately to the creditors. It is not used in the management or operation of a going business, with the attendant risk of loss, but is used in reducing existing liabilities. With the wisdom of the plan, inaugurated to meet a recognized emergency, we are not concerned, nor have we heard it in any manner criticized. Indeed, we are impelled to believe that it is the best that sagacious minds, well versed in financial experience, could, under the existing circumstances, devise.

It is argued, however, that a state bank receivership is purely statutory; that, by the banking statute, Rem. Comp. Stat., § 3276, the legislature divested the courts of their chancery prerogatives of appointing receivers of state banks and controlling them as officers of the court; and further, that the courts have no power, either to confer additional authority upon the statutory receiver or to approve any action which he may propose to take, unless that power is specifically reserved in the courts, or given to them, by the statute.

That the state supervisor of banking is, technically, a statutory receiver, may be admitted. But we do not accede to the proposition that the courts have been shorn of their chancery prerogatives of appointing receivers or of directing and controlling them as officers of the court. Even if the legislature had intended to effect that result, it was, in our opinion, powerless to accomplish it. At the common law, courts of equity had jurisdiction of such cases. That jurisdiction was retained in them by the provisions of our state constitution, Art. IV, § 6, which reads in part as follows:

"The superior court shall have original jurisdiction in all cases in equity . . .; of proceedings in insolvency; . . . and for such special cases and proceedings as are not otherwise provided for. The superior court shall also have original jurisdiction in all cases and of all proceedings in which jurisdiction shall not have been by law vested in some other court; . . ."

The administrative method provided for in the state banking act does not constitute a "special case or proceeding" as contemplated in the words quoted from the constitution.

If, then, the courts were vested with jurisdiction by virtue of the constitutional mandate, the legislature had no right or authority to deprive them of it. The provisions of the banking act are not comparable to the workmen's compensation act, which created a wholly new field of action or subject of contest and established a quasi-judicial body for its administration. The banking act merely seeks to provide a new, or rather an additional, and no doubt more flexible and expeditious, method of administering certain complex situations. Assuming that it is advisable in all cases that the method prescribed by the legislature should be followed, nevertheless, in our opinion, it is

not an exclusive method in the sense of ousting the courts of their jurisdiction, because the legislature can not take away from the courts powers which they constitutionally possess.

This court has heretofore at least once expressed the view that the procedure prescribed by the statute is not exclusive. In *State ex rel. Coulee State Bank v. Farnsworth,* 125 Wash. 264, 215 Pac. 355, the court, after referring to the sections of the statute which we have already quoted and indicated, said on pages 266, 267:

"As we read the act, it does not provide that the power of the banking department, as outlined in these sections describing the procedure where the bank remains in the hands of the department for liquidation, is exclusive. The purpose of the act was as far as possible to provide for the satisfaction of all claims of depositors and creditors and to save as much as possible for ultimate return to the stockholders. If all these interested depositors, creditors and stockholders have all their claims satisfied, the purpose sought by the act has been accomplished, and when they present themselves to the banking department and say that they have now been satisfied, and the department's expenses in the administration of the estate have been provided for, there would seem to be no reason in law or in common sense why the banking department should not then release to the directors the assets remaining in its hands."

In *State ex rel. Dunbar v. Superior Court,* 161 Wash. 550, 297 Pac. 774, this court said at page 554:

"Since time immemorial, courts of equity, under the common law, have had exclusive jurisdiction of causes seeking the appointment of receivers, and any statute designed to oust the courts of their jurisdiction would be in derogation of the common law and therefore to be strictly construed."

While a statute may change the common law, it may not nullify the constitution.

Whatever attempt the legislature may have made to wholly oust the courts of their jurisdiction to appoint receivers of state banks and subsequently control them, we think that all that it could, or did, do in that respect, was to provide an additional method of appointing such receivers, without trenching upon the courts' inherent authority in the premises. A reading of the entire banking act convinces us that the legislature did not even attempt to exclude the courts from the supervsion of such banks. We think that the least that can be said is that the supervision of such banks is vested by law jointly in the courts and the state supervisor of banking; that, while the supervisor has been entrusted with all preliminary, routine matters, and all such matters as an equity receiver ordinarily disposes of without an order of the court, yet in all matters of vital concern the court still retains full jurisdiction. The assets of the bank are in *custodia legis*.

*Hanson v. Sogn,* 50 S. D. 44, 208 N. W. 228; *Breese v. Bramwell,* 110 Ore. 105, 223 Pac. 239; *Van Meter v. State,* 132 Okl. 230, 270 Pac. 41; *Mothersead v. Harris,* 148 Okl. 285, 298 Pac. 602; *Frederick v. McRae,* 157 Minn. 366, 196 N. W. 270.

When the legislature passed the banking act it certainly did not envisage the exigency that now exists, and there was, therefore, no occasion to specifically provide for it. But taking the language of the statute as it stands, we think it sufficiently broad to authorize the supervisor to negotiate the loan under consideration, provided that it is approved by the court after a proper notice and hearing thereon, as appears to have been done in this case. We think, moreover, that the court, by virtue of its equity jurisdiction, had the

power to consider and approve the proposed acts of the supervisor.

The relief sought under the writ will be denied, and the decree of the lower court will, on the pending appeal, be confirmed.

It is so ordered.

HOLCOMB and HERMAN, JJ., concur.

TOLMAN, C. J., and BEALS, J., concur in the result.

MILLARD, J. (dissenting)—I grant, *solus arguendo,* that the power to appoint receivers is inherent in courts of equity, and that the legislature can not divest the courts of that prerogative. However, equity courts at the common law, and at the time of the adoption of our state constitution, did not have, and at the present time in the absence of statutory authority therefor, they do not have, the power to authorize and direct chancery receivers to borrow money for any purposes other than that of preservation of the property of the insolvent or the continuance of the insolvent's business. In the case at bar, the borrowing is not for either purpose.

On January 30, 1932, an examination disclosed that the Cashmere State Bank, of Cashmere, Washington, was insolvent. On that date, pursuant to the banking act, Rem. Comp. Stat., §§ 3266-3277, outlining the procedure to be adopted by the banking department in the event of a state bank's insolvency, the state supervisor of banking closed the bank, and took possession of all the property and business of the bank for the purpose of liquidation.

The Congressional act of January 21, 1932, created the Reconstruction Finance Corporation, which was authorized to make loans, upon certain terms and conditions, to any bank in process of liquidation to aid in the reorganization or liquidation of such bank.

On March 22, 1932, the state supervisor of banking petitioned the superior court of Chelan county for an order authorizing and directing the supervisor to apply to the Reconstruction Finance Corporation for a loan of not more than one hundred thousand dollars, at such rate of interest as the Finance Corporation required, for the purpose of paying preferred creditors and distributing the balance thereof to the general creditors and depositors as a first dividend; and as security for the loan, if the application were accepted, to pledge to the Reconstruction Finance Corporation all the assets of the insolvent Cashmere State Bank. The court entered an order granting the prayer of the petitioner. The cause is before us upon the duly filed petition in this court of S. M. Sim and W. D. Stewart, depositor and stockholder, respectively, of the insolvent bank, for the review of that order.

Has the superior court the power to authorize the receiver (the state supervisor of banking) of a state bank to borrow money from the Reconstruction Finance Corporation, and to mortgage all of the assets of the bank to secure payment of the loan, for the purpose of enabling the receiver to pay preferred claims and a first dividend to the general creditors and depositors of the insolvent bank? That is the sole question presented by the case at bar. It must be borne in mind that the loan is not for the purpose of protecting the assets of the insolvent bank (borrowing to prevent destruction of the bank's property), nor is the loan sought for the purpose of obtaining funds as a necessary expense in liquidating the assets of the bank.

The state banking act clearly defines the duties and powers of the state officers. The statutory mandate is that, when a state bank becomes insolvent, the state bank examiner shall take possession, forthwith, without the aid of the court, of the property and business

of the bank. After the examiner takes possession thereof, the banking corporation has ten days within which to institute an action to review the examiner's right to possession. Rem. Comp. Stat., § 3275. If, at any time within ninety days after taking possession, the bank examiner determines that all impairments and delinquencies have been made good, he may permit the bank to reopen upon such terms and conditions as he shall prescribe. Rem. Comp. Stat., § 3280. The powers and duties of the examiner in possession of an insolvent state bank are prescribed as follows:

"Upon taking possession of any bank or trust company, the examiner shall proceed to collect the assets thereof and to preserve, administer and liquidate the business and assets of such corporation. With the approval of the superior court of the county in which such corporation is located, he may sell, compound or compromise bad or doubtful debts and upon such terms as the court shall direct sell all real estate and personal property of such corporation." Rem. Comp. Stat., § 3269.

"At any time after the expiration of the date fixed for the presentation of claims, the examiner, subject to the approval of the court, may declare one or more dividends out of the funds remaining in his hands after the payment of expenses." Rem. Comp. Stat., § 3273.

"When all proper claims of depositors and creditors (not including stockholders) have been paid, as well as all expenses of administration and liquidation and proper provision has been made for unclaimed or unpaid deposits and dividends, and assets still remain in his hands, the examiner shall call a meeting of the stockholders of such corporation, giving thirty days' notice thereof, by one publication in a newspaper published in the county where such corporation is located. At such meeting, each share shall entitle the holder thereof to a vote in person or by proxy. A vote by ballot shall be taken to determine whether the examiner shall wind up the affairs of such corporation or the stockholders appoint an agent to do so. The ex-

aminer, if so required, shall wind up such corporation and distribute its assets to those entitled thereto. If the appointment of an agent is determined upon, the stockholders shall forthwith select such agent by ballot. Such agent shall file a bond to the state of Washington in such amount and so conditioned as the examiner shall require. Thereupon the examiner shall transfer to such agent the assets of such corporation then remaining in his hands, and be relieved from further responsibility in reference to such corporation. Such agent shall convert the assets of such corporation into cash and distribute the same to the parties thereunto entitled, subject to the supervision of the court. In case of his death, removal or refusal to act, the stockholders may select a successor with like powers." Rem. Comp. Stat., § 3277.

At common law, courts of equity had exclusive jurisdiction of causes seeking the appointment of receivers. By statute (Rem. Comp. Stat., § 741) the superior court had, prior to the enactment of the banking statute, sole authority to appoint a receiver for, and to wind up the affairs of, a corporation which was in danger of insolvency.

A state bank receivership is purely statutory. By the banking act, the legislature divested the courts of their chancery prerogatives of appointing receivers of state banks and in directing and controlling them as officers of the court. The responsibility as to the wisdom or unwisdom of that course is not involved. The question is not what the legislature should have provided, but what is the law declared by the legislature. The words used are plain; they are susceptible to no other meaning than that the legislature intended to, and did, confer on an executive state officer powers theretofore exercised by the courts. Under any rule of construction of a statute, whether strict or liberal, the legislative intent, when clearly apparent as in the banking statute, must prevail.

Of course, injunctions and other remedies of judicial cognizance may, as in all other cases, be invoked to keep the receiver within his jurisdiction, prevent an arbitrary exercise of power and other wrongful acts. However, the court may not control the receiver in the lawful and proper discharge of his duties in administering the assets of a bank entrusted to him by the legislature and not by the court, except as provided by the statute wherein the approval of the court is required. If the receiver, without aid of the court, was about to borrow money for the purpose of paying dividends and the statute did not authorize him to do so, on proper petition therefor the court would restrain such threatened action. If the receiver has no such power, the court may not lawfully confer it in the absence of statutory authority therefor or unless the court may do so under its general equity powers.

The power of the superior court is limited to the appointment of a temporary receiver in case of imminent necessity. Upon the appointment by the court of a temporary receiver, the clerk of the court is required by the statute to immediately notify the state bank examiner by telegraph and mail of such appointment. The temporary receiver, upon demand of the examiner, surrenders "up to him such possession and all assets which shall have come into the hands of such receiver."

"No receiver shall be appointed by the court for any bank or trust company nor shall any assignment of any bank or trust company for the benefit of creditors be valid, excepting only that a court otherwise having jurisdiction may in case of imminent necessity appoint a temporary receiver to take possession of and preserve the assets of such corporation. Immediately upon any such appointment, the clerk of such court shall notify the state bank examiner by telegraph and mail of such appointment and the examiner shall

forthwith take possession of such bank or trust company, as in case of insolvency, and such temporary receiver shall upon demand of the examiner surrender up to him such possession and all assets which shall have come into the hands of such receiver. The examiner shall in due course pay such receiver out of the assets of such corporation such amount as the court shall allow.'' Rem. Comp. Stat., § 3276.

The receiver of an insolvent state bank is not appointed by the court—as we have seen, the statute expressly deprives the court of the power to appoint a state bank receiver—hence the receiver is not subject to the control and direction of the court, as in the case of chancery receivers. In those states in which the court under the banking statute appoints the receivers of insolvent banks, it may be correctly held that that is a chancery receivership and the receiver has the powers of receivers generally, subject to the control and direction of the court.

The state banking officer takes possession of the property and business of a bank under the statute, and not as an officer of the court. By virtue of the statute, the state banking officer takes possession and holds it without the aid of, and despite, judicial action. Such receiver is an executive creature of the statute, and can exercise only such powers with which the statute vests him. That is to say, he is an executive officer of the state, and derives his powers from the statute, and no order of the court applied for can be broader than the statute.

Section 3269, *supra,* authorizes the examiner, upon taking possession of the insolvent bank, to collect the assets thereof and ''preserve, administer and liquidate the business and assets'' of such bank. There is nothing in that section, or in any other section of the banking act, that expressly or impliedly confers au-

thority on the receiver or empowers the court to authorize the receiver to borrow money and pledge the assets of the bank to secure payment of the loan which is to be used for the purpose of paying preferred claims and a first dividend to the general creditors and depositors. The receiver not having such power, the court may not lawfully confer it in the absence of statutory authority. Nor may the court, under its general equity powers, authorize the receiver of a state bank to borrow money for the purposes stated.

While the statute provides that, with the approval of the superior court of the county in which such bank is located, the receiver may sell all real estate and personal property of the insolvent bank, and with the approval of the court "he may sell, compound or compromise bad or doubtful debts," the court is not thereby expressly or impliedly empowered to authorize the receiver to borrow money for the purposes recited in the receiver's petition. The mortgaging or pledging of the insolvent bank's assets to secure payment of a loan by the Reconstruction Finance Corporation to the bank is not a sale of the property, nor is it a sale or compromise of bad or doubtful debts.

I repeat, the legislature divested the courts of their equity jurisdiction in the matter of appointing receivers of state banks and in directing and controlling them as officers of the court. The assets are not in the hands of a judicial executive officer appointed by the court. The assets are in the hands of a non-judicial executive public officer. Under the statute, I reiterate, the court may not, as it may a chancery receiver appointed by the court, direct or control that non-judicial officer in the proper discharge of his public duties, except as the statute prescribes.

I have no quarrel with the argument that the court may, in a proper case and where there is a necessity

therefor, authorize a chancery receiver to execute a mortgage on property of the estate for the purpose of securing moneys borrowed to preserve or administer it. In some instances, chancery receivers may be directed and authorized by the court appointing them to borrow money to preserve property and assets in the hands of the receiver or protect or care for it.

The right of a chancery receiver to borrow money is very limited. The power of a court of chancery to authorize the issuance of receivers' certificates grows out of its duty to protect and preserve the property of the corporation in its hands. 25 R. C. L. 95. The theory of receivership certificates came into being because of necessity of continuing operation of railroads and other public service corporations. The allowance of the issuance of receivers' certificates is confined to cases involving railroads and other corporations in the continued operation of which the public have an interest.

"Where the court takes charge of railroads or other corporations affected with a public use, and undertakes to operate them through a receiver, the necessary debts of such operation may, as against all parties to the suit, be made a prior lien upon the income, and if that be insufficient, upon the property itself. But, as has been frequently stated, this is an extraordinary power; and it is exercised only because of the public duty resting upon such corporations and the public interest accordingly involved in the continuance of their operation." *Craver v. Greer,* 107 Tex. 356, 179 S. W. 862.

Of course, it is not contended that the bank will be or could be kept open for the doing of business and thereby be performing a service to the public. A bank is not a public service corporation.

In the case of a private corporation, the court may authorize a receiver to borrow money upon the faith and credit of all the property of the insolvent cor-

poration, but only for the one purpose of preservation of the property. *Lockport Felt Co. v. United Box Board & Paper Co.*, 74 N. J. Eq. 686, 70 Atl. 980. Such borrowing, the courts uniformly hold, is justified on the ground of preservation of the property. We should be mindful of the fact that "preservation" as applied to borrowing in the case of a private receivership, means prevention of destruction of the property. 53 C. J. 187; *Rhode Island Hospital Trust Co. v. S. H. Greene & Sons Corp.*, 50 R. I. 305, 146 Atl. 765.

In the case at bar, the borrowed money would not be used to "preserve" and "liquidate" the business and assets of the bank. To pay dividends with borrowed money is not "preservation" of the property of the bank, neither is it a liquidation of the business and assets of the bank. It is not a dissipation or destruction of the property of the bank to hold frozen assets until they become more liquid. The borrowed money would be used to pay dividends.

The borrowing of one hundred thousand dollars for such purpose with interest, pledging assets of one hundred and fifty thousand dollars to secure its payment, would add one hundred thousand dollars with accrued interest, costs and expenses to an already existing indebtedness of the insolvent bank which is unable to pay the preferred claims and a first dividend to general creditors and depositors unless it obtains the loan. From what source will funds be derived to pay either principal or interest of the loan as it matures, except on foreclosure with further costs and expenses? It may be that it is anticipated that all that will ever be realized will be the borrowed money of the Reconstruction Finance Corporation; that, with such a loan, the depositors and creditors will receive more than could be realized from liquidating the assets without borrowed money, and that the Reconstruction

Finance Corporation may bear whatever deficit may result.

There is no showing that the property will be lost or destroyed. Payment of dividends may be deferred until the frozen assets become more liquid. They will not be made liquid by the borrowing thereon and paying interest on the loan until the hoped for time when the pledged assets are sufficiently thawed to pay the loan, with interest thereon, etc. The borrowing of the money on the faith and credit of the assets to pay dividends, would not *ipso facto* discharge the receiver. The receivership would continue until the final winding up of the affairs of the insolvent bank.

Such receiver could, as well as the Reconstruction Finance Corporation, hold the assets until liquidity, if that ever happens. The receiver is not, under the statute, required to sacrifice the assets immediately. We are not aware of any statute forbidding the retention by the receiver of the assets for a period of time as long as that for which he could pledge them to the Reconstruction Finance Corporation. Though the retention by the receiver might delay the payment of dividends, the expense of the receivership would be lessened. At least, there would not be the interest to pay on the loan of one hundred thousand dollars.

It is argued: The duties of the receiver are of a public nature; that, in the discharge of those duties, he acts in the public interest; and that capacity coextensive with the nature of the office and the object to be accomplished must be inferred. I understand the majority to say, in effect, that the court granted no power to the receiver, but authorized him under the statute to exercise the implied statutory authority conferred upon him. But the authority to the superior court to approve the doing of certain things by the statutory receiver specifically enumerated in the stat-

ute, can not be extended to include other things, or as conferring power upon the court to, in turn, confer or attempt to confer on the statutory receiver any further or different power or authority.

In the case of a chancery receiver, the court cannot lawfully authorize such receiver to borrow money and pledge the assets of an insolvent bank for the purpose of paying dividends to creditors and depositors of such insolvent. The banking act does not authorize the receiver of a state bank, either with or without the approval of the court, to borrow money on the faith and credit of the assets of the insolvent bank for the purpose of paying dividends.

Mindful of the absence of authority of a receiver of a national bank to pledge the assets of such bank for a loan, the Congress expressly authorized national bank receivers—the legislature has not authorized state bank receivers—to borrow from the Reconstruction Finance Corporation, and to pledge the assets of the insolvent bank as security for the loan.

" . . . and any receiver of any national bank is hereby authorized to contract for such loans and to pledge any assets of the bank for securing the same . . . " Sec. 605, U. S. Code, Title 15.

The Congress of the United States may not by enactment enlarge the powers of a receiver of a state bank. That is a province in which only the state legislature may function.

While we, if acting as legislators, might support such legislation as that desired by the respondent, we as a court should not read into the act something which is absent therefrom. We should be governed by the law as written. Though it be desirable for the Federal government to, in effect, take over insolvent state banks for liquidation, I find no sanction by the sovereign state of Washington therefor.

I find no authority for the borrowing of money by the receiver of a state bank, and the payment of interest thereon, from the Reconstruction Finance Corporation for the purpose of paying dividends to certain creditors of the insolvent bank. A going concern, though in financial distress, might be aided by borrowing money to continue in business. I can not see how an insolvent bank, which has ceased to function and whose property and assets (which are wholly insufficient to pay its liabilities) have been taken over by a receiver for liquidation, can be aided or its creditors benefited by borrowing money (for payment of dividends) and pledging its assets to secure its payment and thereby increasing the indebtedness; it not being shown that such loan was necessary to prevent the destruction of the property of the insolvent bank. We judicially know that a loan now will not afford the creditors and depositors "the facilities for obtaining credit for seed, the planting of crops, and spraying and pruning of orchards." The crops have been planted, and the time for the spraying and pruning is past.

The order appealed from should be reversed, and the cause remanded with direction to the superior court to dismiss the petition.

MAIN, PARKER, and MITCHELL, JJ., concur with MILLARD, J.