L. A. ANDREW, Superintendent of Banking, Appellee, v. DELAWARE COUNTY STATE BANK of Manchester, Defendant; JENNIE R. JOHNSON, Intervener, Appellant.

No. 42052.

AUGUST 15, 1933.

A. M. Cloud, Havner, Flick & Powers, and Henry S. Blum, for appellant.

Donnelly, Lynch, Anderson & Lynch, and Thomas H. Tracey, for appellee.

EVANS, J.—The bank above named went into the hands of the receiver on May 24, 1932. On the same date an order was entered fixing the status of the great body of depositors as follows:

"It is ordered, adjudged and decreed by the court that all claim against said bank arising out of deposits and all checking account and all savings deposits, and all deposits represented by certificates of deposit, both time and demand, except certificates issued for money borrowed for said bank, as the same are shown on the books of said bank, be and the same are hereby allowed in the amounts and to the individuals as shown by the said books. Said claims being allowed as claims of depositors of said bank without further proof thereof. Provided, however, that should any depositor whose claim is so allowed claim any additional sum or sums over and above the amount as shown by the books of said bank, then said depositor shall be required to file claim for said excess amount as other claimants within the time limit as herein otherwise provided.

"It is further ordered, adjudged and decreed by the courts that all other claimants than those whose claims are allowed in the amount as stated and including depositors claiming an excess over

the amount shown by the books of the bank (as to said excess) shall present proof against said bank on or before the 25 day. of July, A. D. 1932, as follows:"

Under such order of the court the appellant was classified as a depositor and was entitled to the preference of a depositor, and her claim was recognized to the full amount now claimed by her. However, on July 23, 1932, she filed in the receivership case a petition of intervention wherein she claimed a special preference over the great body of the depositors. Her claim of special preference is not predicated upon the character of her own deposit. On the contrary, it is predicated upon the alleged conduct of the other depositors and upon certain acts done by other depositors which operated, as alleged, as an estoppel against them whereby the parity of depositors was waived by such other depositors and whereby the appellant became entitled to be first paid in full out of the assets of the insolvent bank to the exclusion of the other depositors.

The record discloses that in February, 1932, the bank in question was threatened with a "run". During a few weeks preceding such date, hundreds of thousands of dollars in deposits had been withdrawn. The rate of withdrawal of the deposits during the preceding weeks, if continued, would result in closing the doors of the bank within a brief time. A holiday was proclaimed by the mayor of the town, which continued for several days. Thereupon an appeal was made by the bank officials to its depositors for waivers. A form of waiver was prepared and submitted for the signature of depositors, which was as follows:

"Depositor's Agreement.

"In consideration of the signing of a similar agreement by other depositors, I, the undersigned, a depositor in

"The Delaware County State Bank of Manchester, Iowa, recognizing the solvency of said bank and desiring its continuance in that condition unhampered by heavy and unwarranted withdrawals of deposits, hereby agree with such other depositors in said bank and with said bank on behalf of myself, my heirs, executors and assigns, as follows:

"(1) Not to sell or assign any certificate of deposit owned or controlled by me or my minor children in said bank, and at the maturity thereof accept the interest then due and take a new certificate of deposit of the same bank for the amount of the principal

thereof, due three years after that date, with interest at 3%, payable annually.

"(2)   Not to sell or assign any savings account deposit owned or controlled by me or my minor children in said bank nor to withdraw funds from the same to reduce it below its present balance during a period of three years and to accept 3% interest thereon from the next interest paying date.

"(3)   Not to reduce the balance in any checking account owned or controlled by me or my minor children in said bank more than 10% per elapsed month from the date of this agreement.

"(4)   Any new deposits of any kind made by me in the above bank after the date hereof shall not be affected by any of the above restrictions.

"The consideration of this agreement is the signing of a similar agreement by those who control a sufficient number of deposits to satisfy the officers of the bank that heavy and unwarranted withdrawals can not be made.

"It is further agreed that officers of said bank may waive or modify any or all restrictions contained in this agreement if in their judgment conditions warrant it.

"Dated this 12th day of February, 1932, at Manchester, Iowa."

From 90 to 95 per cent of the depositors signed the foregoing waiver. The holiday was terminated, and the bank continued in operation until May 24, following. On that date it was compelled to close its doors. The amount of deposits covered by the waiver was in excess of $900,000. The amount of deposits not covered by the waiver was $63,000. The $63,000 comprised as a part thereof the deposit of the appellant, who had refused to sign the waiver. The theory of recovery advanced by the appellant is predicated upon three grounds. Her first ground is stated in her brief as follows:

"That those who joined in, understood and agreed that the deposits of this Intervener and those who did not sign were to be paid prior to those joining in the agreement.

"That those signing the agreement agreed with the bank, its officers, and the others joining in said agreement, in reopening the bank that the assets would be used to pay this Intervener's deposits before those signing the agreements.

"That the Intervener claims the benefit of said agreement.

"That those signing the agreement thereby authorized, and the officers of the bank, acting on such authority, paid large amounts of money to others who did not sign the agreements between the 18th of February when the bank reopened and the 24th of May when it went into the hands of the Receiver, to the *great prejudice* of this Intervener's rights."

Her second ground is that the signing of the waivers by the consenting depositors operated to the prejudice of the appellant as a nonconsenting depositor, in that it enabled the bank to continue operations, whereas it would have been to the advantage of the appellant (as alleged) to have forced the bank into receivership at that particular time. Upon the trial of the case, by an amended petition, the appellant advanced a third ground, viz: that the consenting signers by their conduct lost their status as depositors and became mere lenders of money to the bank.

The foregoing indicates the general outlines of the controversy. It will be seen that the case is unique both in its objective and in its procedure. The appellee vigorously attacks the procedure. The consenting depositors whose rights are thus assailed were not made parties to the proceeding. Nor were they named in the petition. Nor do their names appear in this record, except that the names of a few of them appear incidentally. In view of our conclusion upon the larger merits of the controversy, we are not disposed to give consideration to these contentions of the appellee. We shall therefore treat the proceeding as an intervention for the purpose of our discussion without assuming to pass upon the adequacy or propriety of the procedure.

I. Taking up the first ground above stated, it takes on the form of an express agreement by the "95%" of "signers" that the appellant should take priority over them and that she should be first paid out of the assets of the bank. The record discloses no express evidence of such an agreement. The allegation rests for its proof wholly upon legal deduction and inference. The argument is that such was the necessary legal effect of the waiver signed by the "95%". This ground is therefore reduced to the question whether the signing of the waiver by the "95%" was the legal equivalent of an express agreement that the appellant should take priority over the "95%" of consenting depositors. We think not. The implications of the record as a whole are to the effect that the "95%" had no purpose or intent or motive to lose their parity or status as depositors. They

were assured that the distress of the bank was temporary and that it would be able to pay all its depositors if only it could be carried over the present menace of a "run". The very motive of the concessions made by them was in the direction of *saving their deposits* by saving the bank. Many of the signatures had been obtained upon the representation that *all* the depositors must sign. This record discloses no ground for attributing to the "95%" any other motive for their actions than the hope and belief that they could thereby save the solvency of the bank.

We hold that the first ground is untenable.

II. Were the "95%" guilty of any conduct that operated as an estoppel upon them? Appellant contends that she was prejudiced by their conduct. Appellant's mental operation, whereby prejudice becomes apparent to her, is itself quite unique. The claim is that, if the waivers had not been signed, the bank would not have opened after the holiday; that, because of the signing of the waivers, the bank did operate, and that this was contrary to the interest of appellant. She held seven certificates of time deposit. None of them was due until June 1, 1932. The idea advanced by appellant is that, if the bank had been closed in February, this would have accelerated the due date of her certificates, and that she would have been in position to collect them at once; whereas the continuation of the bank as a going concern prevented her from enforcing her certificates before their due date. The argument assumes that, if the bank had been closed in February, the appellant would have obtained full payment of her deposit. Obviously she would have obtained her pro rata share and no more. She would have stood on an exact parity with every other depositor. Such was the exact position which she occupied on May 24, when the bank did close. Of course, if the bank had continued to operate until after June 1, the appellant might have collected her certificates by presentation thereof. She would have been in a position on that date to enforce immediate payment. In such a case the operation of the bank from February to June 1 would have been in her favor. The action of the majority in extending the life of the bank, if it had been fully successful, would therefore have operated to the benefit of the appellant and not to her injury. Nothing appears in the record which would warrant a holding that the extension of the life of the bank to May 24 worked any prejudice to the appellant or made her deposit worth one whit less than it would have been if the bank had

been closed in February. In the absence of prejudice, there could be no estoppel. Nothing is clearer upon this record than that the rights of the appellant were not prejudicially affected in any degree by the action of the "95%". If the bank was in fact solvent, then appellant was not entitled to have it closed in February. If, on the other hand, it was in fact insolvent, as appellant contends, she was not bound to submit to its continuing operation. She had power equal to that of any other depositor to put the question of solvency to the test by applying for a receiver. She was not precluded by the action of any other stockholder or by a majority thereof from pursuing any available remedy for the protection of her rights. She was not entitled to demand of any other depositor that he should vote in accordance with her views.

III. The final point urged is that the "95%" lost their status as *depositors* and voluntarily became *lenders*. The argument is that the extension of time granted by the waivers amounted in legal effect to a loan for the amount of the deposits, and that the "95%" thereby lost their parity with the appellant. The appellant cites no authority in support of her contention at this point. No authority is cited by either side which is directly in point. Such absence of authority is suggestive that the point itself is anomalous. Our own cases have considered the distinction between a loan and a deposit. The logic of these cases is against the position of the appellant.

In Murray v. First Trust & Savings Bank, 201 Iowa 1325, 207 N. W. 781, 783, we discussed the question as follows:

"The question before us for adjudication is whether the facts of the transaction under consideration had the legal effect to constitute the intervener a money lender rather than a depositor. *The definite distinction between a deposit and a loan has never been formulated.* All attempted definitions recognize the close relation between the two and the difficulty of laying down any specific rule or distinction, applicable alike to all cases. A tentative or proximate definition has been put forward, and has frequently received judicial approval, as far as it goes. This is that a deposit is always subject to withdrawal upon the demand of the depositor, whereas a loan is subject to call only on and after its maturity date. The deficiency of this definition is that it takes no account of time deposits, nor of call or demand loans. This definition was approved by this court as an abstract proposition in State ex rel. Carroll v. Corning St. Sav. Bank,

136 Iowa 79, 113 N. W. 500. And yet in the same case the holder of a certificate of time deposit due in 12 months, with 6 per cent interest, was held to be indubitably a depositor, and his claim was classified accordingly. Regardless of specific definition, the courts are agreed that there is a distinction between a deposit and a loan. Whether in a given case a transaction is to be deemed a loan or a deposit is a question to be decided upon the facts of that case."

See, also, Partch v. Krogman, 202 Iowa 524, 210 N. W. 612; Carroll v. Corning State Savings Bank, 136 Iowa 79, 113 N. W. 500; Estate of Olson, 206 Iowa 706, 219 N. W. 401; Elliott v. Capital City State Bank, 128 Iowa 275, 103 N. W. 777, 1 L. R. A. (N. S.) 1130, 111 Am. St. Rep. 198; Officer v. Officer, 120 Iowa 389, 94 N. W. 947, 98 Am. St. Rep. 365; Hunt v. Hopley, 120 Iowa 695, 95 N. W. 205; People v. Belt, 271 Ill. 342, 111 N. E. 93; McCormick v. Hopkins, 287 Ill. 66, 122 N. E. 151.

We will not take the time to analyze the foregoing. The trend of discussion in all of them is hostile to the position of the appellant. Clearly all these obligations of the bank were deposits in the first instance. They created the relation of debtor and creditor between the bank and its depositors. The title of the money thus deposited passed to the bank. It never was reacquired by the depositor. If we say that the *depositor* later became a *lender,* what did he *lend?* He had no money to lend. He had parted with his money in the first instance. Ordinarily, one who lends money to a borrower has it in his power to lend or to withhold. Incidental to his loan is his power to choose the borrower. No power of that kind was incident to the transaction under consideration here. In this case the depositor found the bank unable to make immediate payment. He was in danger of losing his deposit because of the pecuniary condition of the bank. The deposit could be saved only by a saving of the bank. The bank could be saved only by forbearance of its depositors. The lender was not lending additional assets to the bank. His only lending was to lend forbearance. In so doing he was acting, as he believed, in his own interest as a depositor. What would it avail him to lend forbearance if as a result thereof he must surrender his rights as a depositor? Obviously he did not intentionally surrender his right of parity with every other depositor. If his conduct were to be so construed, who would dare hereafter to forbear? We deem it clear that these depositors did not intend

to surrender their status as such and that no legal reason is apparent why a change of status should be enforced upon them.

The decree of the district court is accordingly affirmed.

All Justices concur.