RACHEL L. PRIEST, Appellant, v. WHITNEY LOAN & TRUST COMPANY, Appellee.

No. 42749.

MAY 14, 1935.

Clark, Byers, Hutchinson & Garber, for appellant.

Swan, Martin & Martin and Boorman & Whitmore, and Earl C. Mills, for appellee.

Edward L. O'Connor, Attorney-general, and Lehan T. Ryan, Assistant Attorney-general, amici curiæ.

HAMILTON, J.—This is an appeal by plaintiff from an order of court overruling a motion to strike the entire affirmative defense of defendant's answer. Plaintiff is the owner and holder of a certificate of deposit issued by the defendant bank under date of September 1, 1931. Defendant is a banking corporation organized under the laws of Iowa governing state and savings banks and trust companies. The certificate of deposit in question is in the usual form of interest coupon certificates, in the amount of $4,000, with six coupons of $80 each, due each six months. The certificate contains a provision for payment in full at any interest paying date, if desired. Only the first two coupons were paid. Plaintiff asks for judgment for $4,160, being the balance due. The answer admits the allegations of the plaintiff, but pleads as affirmative defense the general financial depression; the emergency under which the President of the United States declared a legal holiday closing all banks; the enactment by the Iowa General Assembly of Senate File No. 111 (chapter 156, 45th General Assembly) ; the operation of said bank by the superintendent of banking under said act; the enactment of chapter 159 of the Acts of the 45th General Assembly; the reorganization of the bank under a plan approved by the superintendent of banking, which was joined in by a large majority of the depositors holding in the aggregate more than 75 per cent of the direct, unsecured, and unpreferred deposits above $10, by which depositors agreed to accept a settlement of their depository liabilities by taking new certificates of deposit for 50 per cent of the

original deposits, to bear interest at 2 per cent, with deferred payments over a period of three years, and by taking trust certificates for the remaining 50 per cent, to be paid from the earnings and collections of an equal segregated amount of the poorer assets of said bank to be held by certain named trustees, augmented by the amount required to be paid into the trust fund by the stockholders, and in addition thereto the earnings of the bank, pledged to the extent of 100 per cent of the amount of the capital stock of said bank, or until said trust certificates are paid in full—all to be prorated and paid by annual dividends to the holders of the trust certificates; all deposits of $10 and under to be paid in full.

This plan was put in writing in what was known as a "Depositors' Agreement" and was sent out to all the depositors of the bank; it was approved by the superintendent of banking, and the stockholders of the bank, at a meeting called for that purpose, approved and ratified the same and pledged the earnings of the bank to the extent of 100 per cent of the capital stock. Plaintiff did not join in this plan of reorganization. A new certificate of deposit for $2,022.67 was issued to the plaintiff the same as other depositors, which amount, with interest according to the terms thereof, has been made available to the plaintiff, and the same is tendered to her in the pleadings, but she has refused to accept the same. Likewise, a trust certificate was issued to the plaintiff for the other 50 per cent in the amount of $2,022.66. This was likewise offered and tendered to her, which she has refused to accept. The bank, under the new organization plan, opened up for business unrestricted on May 1, 1933.

Defendant attaches to its answer copies of the agreement and the resolution of the board of directors, and the new certificate of deposit and trust certificate issued to plaintiff, and alleges that under the statutory provisions plaintiff is bound the same as if she had joined therein. There is no claim of bad faith, or that the law was not complied with in every respect, or that plaintiff has in any way been injured. By her motion to strike, plaintiff says that the matters contained in the answer are incompetent, irrelevant, and immaterial, and constitute no defense to her cause of action, and that chapter 159 of the Acts of the 45th General Assembly is unconstitutional as impairing the obligation of plaintiff's contract under the provisions of the federal and state constitutions, and as violating the due process clause of the Fourteenth Amendment to

the federal constitution. The merits of the plan of rehabilitation and reorganization and partial liquidation of the bank and its assets are not involved. The only question presented and argued is the constitutionality of said chapter 159. The constitutional questions involved in this case are so interwoven and so often presented and treated together in the cases, and the same reasoning and discussion advanced as to one is usually applicable to the other, that we shall not attempt a definite separate treatment of the same in this opinion.

To correctly apply legal principles we must keep in mind the particular character of the issues involved and the parties or persons in interest,—in the instant case, a depository agreement between an individual and a banking corporation. The relations of the parties and the rules of law applicable are not in all respects the same as those between individuals or private corporations. This is due to the fact that the business of banking is affected with a public interest. In a recent case, Leach v. Beazley, 201 Iowa 337, 342, 207 N. W. 374, 376, this court, in an opinion by Justice Albert, said:

"The relation existing between a banking corporation and the general public is wholly different from that of the relation between the general public and a private corporation. We have recognized the thought *that banks are affected with a public interest* by the legislature's establishment of a state banking department under whose supervision these banking institutions are established, controlled, and conducted, and, in cases of insolvency, liquidated. This we have not done with any private corporations." (Italics ours.)

And, again, in the case of In re Harris Estate v. West Grove Savings Bank, 207 Iowa 41, at page 46, 217 N. W. 477, 480, the late Justice Morling said:

"The chief purpose of state supervision is to protect and safeguard the public in their relation to the bank as depositors, and in the acceptance of checks as a convenient, circulating medium. Their safety, and, in case of closing, their liquidation, is a matter of *general public interest. State supervision and administrative liquidation are therefore a proper exercise of the police power of the state.* Noble State Bank v. Haskell, 219 U. S. 104 [31 S. Ct. 186], 55 L. Ed. 112 [32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487]; Shallenberger v. First State Bank, 219 U. S. 114 [31 S. Ct. 189], 55 L. Ed.

1286

117; Kentucky Union Co. v. Commonwealth of Kentucky, 219 U. S. 140 [31 S. Ct. 171], 55 L. Ed. 137; Commissioner of Banks v. Prudential Tr. Co., 242 Mass. 78, 136 N. E. 410; 7 C. J. 474, 480. *The banking laws must be construed in the light of the purpose of their enactment,* the evils to be cured, and the remedy designed, as well as in connection with statutes in *pari materia* and in harmony, with general principles of law." (Italics ours.)

Banks are universally recognized as quasi-public corporations. 3 R. C. L. page 379; McConville v. Ft. Pierce Bank & Trust Co., 101 Fla. 727, 135 So. 392.

■ We have also said that "when the constitutionality of a legislative act is challenged by a litigant, the burden is upon him to show why the legislation thus should be overthrown and rejected." Loftus v. Department of Agriculture, 211 Iowa 566, at page 569, 232 N. W. 412, 415. There is no presumption against the validity of an act of the legislature. On the contrary, all presumptions are in its favor, and a statute will not be held unconstitutional unless its contravention of constitutional guaranties is so clear, plain, and palpable as to leave no reasonable doubt on the subject. City of Des Moines v. Manhattan Oil Co., 193 Iowa 1096 at page 1117, 184 N. W. 823, 188 N. W. 921, 23 A. L. R. 1322. The unconstitutionality must plainly, clearly, and palpably appear, and if the constitutionality of a legislative act is doubtful, courts will resolve the benefit of the doubt in favor of the legislature's power. State v. Manning, 220 Iowa ......, 259 N. W. 213 at page 216; Loftus v. Department of Agriculture, supra; Gallarno v. Long, 214 Iowa 805, at page 817, 243 N. W. 719.

Under the law as it existed in this state on September 1, 1931, the date upon which the deposit involved in this action was made and the contract entered into between the depositor and the defendant bank, the superintendent of banking was clothed with the power of complete supervision of the banking institutions of Iowa, with the right to enforce their involuntary dissolution whenever in his judgment and discretion they were found to be insolvent or in an unsafe condition. Leach v. Exchange State Bank, 200 Iowa 185, 203 N. W. 31, 34.

Section 9238 of the 1931 Code of Iowa provides:

" * * * if the said superintendent shall become satisfied that any such bank is in an insolvent or *unsafe condition,* or *that the*

*interests of creditors require the closing of any such bank,* he MAY appoint an additional bank examiner to assist *him* in the duty of liquidation and distribution, whereupon the right of levy, or execution, or attachment against said bank or its assets shall be suspended."

Section 9239-a1 provides:

"Agreement as to reorganization, consolidation, or sale. If a majority of the creditors holding direct unsecured and unpreferred obligations of such bank in excess of ten dollars each, and totaling in the aggregate amount seventy-five per cent of all direct unsecured and unpreferred obligations, shall agree in writing to a plan of disposition and distribution of assets through sale to another bank, *reopening, reorganization,* or consolidation of the bank, the district court in which such receivership is pending, upon application of the superintendent of banking, may order a disposition and distribution, sale to another bank, or reopening, conforming in general to the provisions of such plan."

 The depository agreement is inherently subject to all laws existing at the time the deposit was made and the depositor is conclusively presumed to have made said deposit with the knowledge of the existence of all such laws which might affect his rights in connection with said deposit. Walker v. Whitehead, 16 Wall. 314, 21 L. Ed. 357; Hoff v. First State Bank, 174 Minn. 36, 218 N. W, 238; Doty v. Love, 55 S. Ct. 558, 560, 79 L. Ed. 632, 96 A. L. R. 1438. Not only this, but it has been universally held by courts of last resort everywhere that contracts made with institutions such as banks' affected with a public interest are likewise inherently subject to the paramount power of the sovereign state, the people— the reserve power, sometimes called the police power—to enact, through the legislature, additional remedial legislation in the public interest, affecting the supervision, regulation, control, or liquidation of banking corporations. West River Bridge v. Dix et al, 6 How. 507, at page 533, 12 L. Ed. 535, 546; Home Building & Loan Assn. v. Blaisdell, commonly known as "The Minnesota Case", 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481.

Chief Justice Waite, as early as the year 1883, in the case of Canada Southern R. R. Co. v. Gebhard, 109 U. S. 527, 3 S. Ct. 363, 369, 27 L. Ed. 1020, speaking of this reserve power, said:

"Every member of a political community must necessarily part with some of the rights which, as an individual, not affected by his relation to others, he might have retained. Such concessions make up the consideration he gives for the obligation of the body politic to protect him in life, liberty, and property. Bankrupt laws, whatever may be the form they assume, are of that character."

Speaking of legislation of this character in the exercise of the dominant power of the state, through the legislature, Justice Kindig, in the case of Des Moines Joint Stock Land Bank v. Nordholm, 217 Iowa 1319, at page 1341, 253 N. W. 701, 712, in sustaining the moratorium statute, said:

"If the state legislation now under consideration 'is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end,' all contracts are made subject to the legislation. Barnitz v. Beverly, 163 U. S. 118, 16 S. Ct. 1042 [1045], 41 L. Ed. 93; Home Building & Loan Association v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481; Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165; Marcus Brown Holding Co., Inc., v. Feldman, 256 U. S. 170, 41 S. Ct. 465, 65 L. Ed. 877; Edgar A. Levy Leasing Co., Inc., v. Siegel, 258 U. S. 242, 42 S. Ct. 289, 66 L. Ed. 595. See, also, People v. La Fetra, 230 N. Y. 429, 130 N. E. 601, 16 A. L. R. 152; Atlantic Coast Line Railroad Co. v. City of Goldsboro, 232 U. S. 548, 34 S. Ct. 364, 58 L. Ed. 721 (N. C.) ; Manigault v. Springs et al., 199 U. S. 473, 26 S. Ct. 127, 50 L. Ed. 274; Louisville & Nashville Railroad Co. v. Mottley, 219 U. S. 467, 31 S. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671; Union Dry Goods Co. v. Georgia Service Corporation, 248 U. S. 372, 39 S. Ct. 117, 63 L. Ed. 309, 9 A. L. R. 1420."

The Supreme Court of the United States said in Lawton v. Steele, 152 U. S. 133, 14 S. Ct. 499, 501, 38 L. Ed. 385:

"To justify the state in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private

business, or impose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts." Loftus v. Department of Agriculture, 211 Iowa 566, at page 572, 232 N. W. 412.

In the case of Home Building & Loan Assn. v. Blaisdell, commonly known as "The Minnesota Case", 290 U. S. 398, 54 S. Ct. 231, 236, 78 L. Ed. 413, 88 A. L. R. 1481, Justice Hughes said:

"To ascertain the scope of the constitutional prohibition we examine the course of judicial decisions in its application. These put it beyond question that the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula. * * *

"Not only is the constitutional provision qualified by the measure of control which the state retains over remedial processes, but the state also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end 'has the result of modifying or abrogating contracts already in effect.' Stephenson v. Binford, 287 U. S. 251, 276, 53 S. Ct. 181, 189, 77 L. Ed. 288 [301] [87 A. L. R. 721]. Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worth while,—a government which retains adequate authority to secure the peace and good order of society. This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this court."

After citing and reviewing previous cases, he says further:

"It is manifest from this review of our decisions that there has been a growing appreciation of public needs and of the necessity of finding ground for a rational compromise between individual rights and public welfare. The settlement and consequent contraction of the public domain, the pressure of a constantly increasing density of population, the interrelation of the activities of our people and the complexity of our economic interests, have inevitably

led to an increased use of the organization of society in order to protect the very bases of individual opportunity. Where, in earlier days, it was thought that only the concerns of individuals or of classes were involved, and that those of the state itself were touched only remotely, it has later been found that the fundamental interests of the state are directly affected; and that the question is no longer merely that of one party to a contract as against another, but of the use of reasonable means to safeguard the economic structure upon which the good of all depends.

"It is no answer to say that this public need was not apprehended a century ago, or to insist that what the provision of the constitution meant to the vision of that day it must mean to the vision of our time. If by the statement that what the constitution meant at the time of its adoption it means today, it is intended to say that the great clauses of the constitution must be confined to the interpretation which the framers, with the conditions and outlook of their time, would have placed upon them, the statement carries its own refutation. It was to guard against such a narrow conception that Chief Justice Marshall uttered the memorable warning,—'We must never forget, that it is a *constitution* we are expounding' (McCulloch v. Maryland, 4 Wheat. 316, 407, 4 L. Ed. 579 [601]— 'a constitution intended to endure for ages to come, and consequently, to be adapted to the various *crises* of human affairs.' * * *

"When we consider the contract clause and the decisions which have expounded it in harmony with the essential reserved power of the states to protect the security of their peoples, we find no warrant for the conclusion that the clause has been warped by these decisions from its proper significance or that the founders of our government would have interpreted the clause differently had they had occasion to assume that responsibility in the conditions of the later day. The vast body of law which has been developed was unknown to the fathers, but it is believed to have preserved the essential content and the spirit of the constitution. With a growing recognition of public needs and the relation of individual right to public security, the court has sought to prevent the perversion of the clause through its use as an instrument to throttle the capacity of the states to protect their fundamental interests. This development is a growth from the seeds which the fathers planted. It is a development forecast by the prophetic words of

Justice Johnson in Ogden v. Saunders [12 Wheat. 213, 6 L. Ed. 606], already quoted. And the germs of the later decisions are found in the early cases of Charles River Bridge v. Warren Bridge, 11 Pet. 420, 9 L. Ed. 773, and the West River Bridge Co. v. Dix, 6 How. 507, 12 L. Ed. 535, supra, which upheld the public right against strong insistence upon the contract clause. The principle of this development is, as we have seen, that the reservation of the *reasonable exercise of the protective power of the state is read into all contracts * * *.*"

The legislative power to enact or amend remedial statutes and to make the new statute applicable to existing contracts is quite universally recognized in all jurisdictions. Only extraordinary and exceptional provisions have ever been denounced by the courts as impairing the obligation of the existing contract. Grain Belt Ins. Co. v. Gentry, 208 Iowa 21, 222 N. W. 855; Bronson v. Kinzie, 1 How. 311, at page 315, 11 L. Ed. 143.

After the enactment of chapter 189 of the Acts of the Fortieth General Assembly, our banking code in this state was a complete code of law and procedure within itself and corresponded very largely to the federal banking code regulating national banks. The federal statute vests the comptroller of the currency with power upon becoming satisfied of the insolvency of any national bank to himself appoint what the act calls a receiver, but who to all intents and purposes is the same as a liquidating officer, or examiner in charge of an insolvent banking institution under the Iowa banking code, such examiner being appointed by the superintendent of banking.

"In title 12 (Banks and Banking) of the United States Code (12 USCA), provision is made in section 2 for the appointment of a 'Comptroller of the Currency.' In section 191 it is provided that: 'Whenever the comptroller shall become satisfied of the insolvency of a national banking association, he may, after due examination of its affairs, * * * appoint a receiver who shall proceed to close up such association, and enforce the personal liability of the shareholders, as provided in section 192.'

"In an action brought to enforce the liability of a stockholder, the Supreme Court of the United States, in Bushnell v. Leland, 164 U. S. 684, 685, 17 S. Ct. 209, 41 L. Ed. 598, said: 'All these alleged errors may be reduced to the single contention that under the na-

tional banking law the comptroller of the currency is without power to appoint a receiver to a defaulting or insolvent national bank, or to call for a ratable assessment upon the stockholders of such bank, without a previous judicial ascertainment of the necessity for the appointment of the receiver and of the existence of the liabilities of the bank; and that the lodgment of authority in the comptroller, empowering him either to appoint a receiver or to make a ratable call upon the stockholders, is tantamount to vesting that officer with judicial power, in violation of the constitution. All of these contentions have been long since settled, and are not open to further discussion.' " Robinson v. Peoples Bank of Leslie, 266 Mich. 178, 253 N. W. 259, at page 261, 92 A. L. R. 1251.

Looking at the situation confronting the court in the instant case, we find that before the enactment of Senate File No. 111 (chapter 156), or Senate File No. 483 (chapter 159), there was vested in the superintendent of banking of the state of Iowa, whenever he became "satisfied that any such bank was in an insolvent or unsafe condition, or refused to pay its deposits, or that the interests of creditors required the closing of any such bank" the power and authority to take possession of such bank and keep it closed until these matters were remedied or the bank liquidated; and during such time "the right of levy, or execution, or attachment against said bank or its assets shall be suspended." It is true that section 9239 provides that the superintendent of banking *may* apply to the district court or judge thereof for the appointment of himself as receiver for such bank, but this is not a compulsory provision. This court held in the case of Leach v. Exchange State Bank, supra, that the superintendent was vested with sufficient power to wind up the affairs of a bank and liquidate the same without the intervention of the court, the court saying in that case:

"It is not difficult to see that many of the affairs of a bank might require the services of a receiver and the direction of the court in their settlement; but the actual 'winding up' of its affairs and the distribution of its assets do not, under this statute, necessarily require either the services of a receiver or judicial direction."

If a court receiver is appointed, under said section 9239, the law makes the superintendent of banking the sole person to be appointed as such receiver, and the bank's "affairs thereafter" shall be under the direction of the court. Provision is then made for

rehabilitation, reorganization, reopening, or sale of assets, or consolidation with the approval of the court in which the receivership of such bank is pending, if "a majority of the creditors holding direct unsecured and unpreferred obligations of such bank in excess of ten dollars each, and totalling in the aggregate amount seventy-five per cent" (section 9239-a1) of such deposits shall agree in writing to such plan.

Thus the law stood on our statute books when the state of Iowa was overtaken by one of the most serious financial crises known to the history of the state. The condition affecting the general public, because of repeated, continual bank failures, which confronted the legislature of the state of Iowa on January 1, 1933, is a matter of common knowledge, and in the construction of statutes, courts will take judicial notice of events and conditions which are generally known and matters of common knowledge within the limits of their jurisdiction. Laackmann v. Glasshoff, 182 Iowa 993, 164 N. W. 768; Stephens v. Wood, 196 Iowa 1394, 195 N. W. 239; Larson v. Larson, 196 N. W. 41; O'Bryon v. Weatherly, 201 Iowa 190, 206 N. W. 828; Dickerson v. Morse, 203 Iowa 480, 212 N. W. 933; Nelson v. Sioux City, 208 Iowa 709, 226 N. W. 41. During the prosperous years preceding, many capital loans had been made and the low price era which followed caused what is known in bankers' parlance as "frozen assets." There was a sharp decline in the liquidity of assets in all our banks. This left the banks unable to respond to the demands for cash on the part of their depositors and creditors, resulting in a loss of confidence. This caused, at the same time, a strong demand for money when the banks were least able to meet the demand. There were constant withdrawals and occasional runs causing a condition of fear and alarm, resulting in the closing of many banks throughout the state. It is a notorious fact that a large per cent of all the business transacted throughout the state was through deposits in banks, and the drawing of checks or drafts or bills of exchange through such banks. This custom of depositing money and savings in banks applied generally to entire families, and there was perhaps no other interest which so vitally affected every citizen throughout the state as the banking business. The weaker banks first succumbed to the extraordinary demands and closed their doors, and soon receiverships were pending throughout the state. As conditions became more acute, many of the more substantial institutions followed in the wake of ruin of the weaker

ones. Finally, some of the outstanding, major correspondent banks were forced to close their doors, which precipitated a general acute, panicky condition among depositors in every community throughout the state. The Bankers' Association of Iowa, aided and assisted by the good citizens of the communities, attempted to stave off the impending disaster by holding meetings and urging depositors to cooperate in an attempt to save the banking institutions of the state for their respective communities. Voluntary waiver agreements were entered into by which patriotic and loyal depositors agreed to "freeze" their deposits for a given length of time, hoping thereby to retain the bank in a condition of solvency until better prices could be had and "frozen assets" could be realized upon. The situation banks were in is well stated by Justice Evans in the case of Andrew v. Delaware County State Bank, 216 Iowa 739, at page 746, 249 N. W. 768, 771, 88 A. L. R. 1003, wherein he said:

"In this case the depositor found the bank unable to make immediate payment. He was in danger of losing his deposit because of the pecuniary condition of the bank. The deposit could be saved only by a saving of the bank. The bank could be saved only by forbearance of its depositors. The lender was not lending additional assets to the bank. His only lending was to lend forbearance. In so doing he was acting, as he believed, in his own interest as a depositor."

There was more or less dissatisfaction with this plan of voluntary waivers, and when the legislature met in January, 1933, one of the first bills to come before this lawmaking body of our state was Senate File No. 111, which was approved on the 20th of January and became a law on the 21st of January, 1933. Under this statute there was provided a zone of safety for banks unable to meet the unusual demands upon them; the law providing that the superintendent of banking, upon application of the officers or directors of any state bank, savings bank, or trust company should have the power, with the consent of the executive council, governor, or lieutenant governor, to take over the management of any such bank and at his discretion manage the same, either by its officers or a part thereof or by any suitable person or persons selected for such purpose by him, and that during such period all the remedies at law or in equity of any creditor or stockholder against any such bank or trust company should be suspended. Likewise, the statute

of limitations should be tolled. He was given specific power by this statute to "wind up its affairs as provided by law or to continue the operation of the same" (section 2), under such rules and regulations as he might make for the conduct of its business and deemed for the best interests of the debtors and creditors of such bank, including the right to compromise any rights, claims and liabilities of such institution, the new deposits to be kept segregated and held as a trust fund for the depositors. He was given power as deemed advisable to reorganize such bank on such terms and conditions as he might prescribe. A reading of this statute, which is now found in chapter 156 of the Acts of the Forty-fifth General Assembly, will disclose that when the defendant bank went under Senate File No. 111, it ceased to be a going concern and was in the hands of the superintendent of banking, who had power to reorganize it or wind up its affairs or apply for a receiver or to liquidate it without the aid of a receiver. The ordinary processes of laws were stayed, and the bank was, for all intents and purposes, in the custody of the law, and was, within the meaning of the term as applied to banking institutions in this state, insolvent; that is to say, it was unable to pay its depositors and other creditors in the usual and ordinary course of business. Much of appellant's argument is based upon the theory that we are here dealing with a solvent bank. It is the settled rule in this state that a bank is insolvent when it is unable to pay its depositors and other creditors in the usual and ordinary course of business. State v. Childers, 202 Iowa 1377, 212 N. W. 63. The very purpose and object of the bank going under Senate File No. 111 and keeping under such act was to make it impossible for depositors to enforce their demands of payment until those interested in preventing a general financial collapse of practically all the banking institutions in the state had time to formulate plans and to get the same into operation, to prevent the necessity of an absolute receivership and the winding up of the bank's affairs at a time and during a period of extreme low prices which would result in untold loss to the entire community. The demand for remedial legislation to allay the fear and lack of confidence in our banking institutions was so acute as to call for federal aid and assistance in many instances, and, as an outgrowth of this, the Federal Deposit Insurance Act was passed by Congress.

We think it is a matter of common knowledge of which this court should take judicial notice that a bank failure is a very serious

calamity to the entire community in which the bank is situated, and therefore all such remedial legislation pertained to a matter of general public interest. As a follow-up measure, promulgating rules and regulations by which banks might reorganize through the assistance and cooperation of the depositors and stockholders and officers of the bank, chapter 159 of the Acts of the Forty-fifth General Assembly or Senate File No. 483 was enacted. This act must be considered as a supplementary measure and in conjunction with the other banking statutes preceding it. Its very language is indicative of the truth of this fact. There is no preamble of any kind in connection with Senate File No. 483. The very first section starts out: "That before any savings bank, state bank, private bank or trust company shall attempt to reorganize or take waivers or depositors' agreements," etc., it shall do certain things. That it is a remedial measure to meet a necessity which existed which affected the general public throughout the state, we think cannot be seriously disputed, and as such, it would readily come within the police power of the state. Hunter v. Coal Company, 175 Iowa 245, 154 N. W. 1037, 157 N. W. 145, L. R. A. 1917D 15, Ann. Cas. 1917E 803; Loftus v. Department of Agriculture, supra; Harris Estate v. West Grove Savings Bank, supra; Home Building & Loan Assn. v. Blaisdell, supra. Similar statutes have been passed by many states in recent years, all of which have been upheld as not infringing or violating the provisions of the constitution with reference to impairment of contracts or the due process clause of the Fourteenth Amendment. Some of these cases will be hereinafter referred to in the discussion of the principles involved, to show the trend of judicial construction.

The provision permitting the majority of the depositors to bind the minority was contained in the statute of the state, section 9239-a1, at the time the plaintiff's deposit was placed in the defendant bank. It is true that at that time it was made applicable only to banks in judicial receivership, and under chapter 159 of the Acts of the Forty-fifth General Assembly this same plan is extended to banks under exactly analogous circumstances under receivership by statute. The results reached are identically the same in both instances. The rights of the depositors were interfered with to no greater extent under the new statute. The assets of the failing institution were not depleted more in any degree under the new statute than under the statute existing at the date of the deposit.

Whether he was a court receiver, or a statutory receiver, whether he was authorized to liquidate under appointment by court according to the terms of the statute, or authorized to liquidate without the intervention of the court under the statute, the results were the same in so far as the depositors were concerned. In either event, the majority of the depositors holding 75 per cent in amount of the unsecured and unpreferred deposits above $10 were permitted to come under the provisions of the plan submitted to the superintendent of banking and approved by him. When the superintendent of banking took charge of the bank and its assets, whether as receiver under a court proceeding, or as statutory receiver or liquidating officer under the statute, either before or after the enactment of Senate File No. 111, or whether, on application of the bank, he took charge of said bank under the terms of Senate File No. 111—the result being the same in each case—the contractual rights of the plaintiff under her certificate of deposit ceased to exist, except her rights to share in the event of the final liquidation of the bank in her pro rata share of the assets of the bank, including all depositors great and small, within the same class or her right to share equally with all other depositors of the same class above $10 under the rehabilitation or reorganization plan adopted by the requisite statutory per cent of the unsecured and unpreferred depositors above $10. Obviously, in either event there was no impairment of her contract within the provisions of either the state or federal constitution (Iowa, article I, section 21; U. S. article I, section 10). She had no contract to impair. For, under the law as it existed at the date of the deposit, when the superintendent of banking took over the insolvent bank, her right to enforce her contract to the extent of withdrawal or demanding payment of her deposit terminated *ab initio*. Kidder v. Hall, 113 Tex. 49, 251 S. W. 497.

In Milner v. Gibson, 249 Ky. 594, 61 S. W. (2d) 273, 276, decided June 6, 1933, the court said:

"A reorganization under it does not deprive the depositors of existing rights, nor impair any contract enforceable by them, for after going into liquidation they no longer have any existing contractual rights to be impaired."

This case holds that the provisions of the statute, permitting the depositors to share in the responsibility of the reorganization

and partial liquidation of the bank, is an additional right and privilege, which, prior to the enactment of said statutory provisions, the depositors did not enjoy, and instead of impairing their rights the law bestows upon the depositors and creditors the right, not existing anterior to its enactment, of participating in the restoration of the control of the assets of the bank to sympathetic interested parties without the expense of a judicial receivership and without impairing the assets or statutory liability of the stockholders.

In Commonwealth v. Hargis Bank & Trust Co., 233 Ky. 801, 26 S. W. (2d) 1045, 1046, the court quoted from its opinion in Cartmell v. Commercial Bank & Trust Co., 153 Ky. 798, 156 S. W. 1048, as follows:

"From the detailed manner in which the legislature has dealt with the subject, it was undoubtedly intended that the procedure, looking toward the closing of insolvent banks and their liquidation, was to be under the supervision of the banking commissioner and to obviate the necessity of going into a court of chancery to procure the appointment of a receiver in order to wind up the affairs of insolvent banks. Indeed, there is no necessity for a receiver, when the banking commissioner proceeds as directed by the provisions of this act, for, when he takes charge of a bank, all of his acts are such as might properly be discharged by a trustee or other person or officer occupying a fiduciary position. The object and aim of the law, in the appointment of a receiver, is to see that the assets of the institution, in charge of which he is placed, are properly, honestly, and economically administered. The ends of the law are satisfied, if the estate is administered in this way, whether the person charged with its administration be termed a banking commissioner, a trustee, or an assignee. The duties are the same. If any difference is to be found, it is in favor of the liquidation of banks, through and under the direction of the banking commissioner, rather than under a receiver appointed by the court." Robinson v. Peoples Bank of Leslie, 266 Mich. 178, 253 N. W. 259, at page 262, 92 A. L. R. 1251.

There is no taking of any portion of the assets which would be liable for the payment of plaintiff's deposit and turning it over to another or others as argued by the appellant. She is still left to share with all others in her class, except as to depositors of $10 or under, and this provision of the statute has been upheld numerous

times on the theory that the cost of making partial payments to the small depositors would amount to·as much as, or more than, paying them in full, as is provided under the present statute. This matter of drawing a line somewhere in reference to small claims and permitting payment thereof in full in matters of insolvency has been recognized by the courts of many jurisdictions as a reasonable and natural classification and in no way harmful or injurious to the depositors as a whole. See, in support of this, Milner v. Gibson, supra; Hoff v. First State Bank, 174 Minn. 36, 218 N. W. 238; Clear Lake Cooperative Assn. v. Weir, 200 Iowa 1293, at page 1298, 206 N. W. 297; Doty v. Love, supra. The law in this respect cannot be said to be arbitrary or unreasonable in its application.

Chapter 159 of the Acts of the Forty-fifth General Assembly might be said to be the plans and specifications laid down by the legislature that had to be met by every closed banking institution covered by this law, before the bank was permitted to open its doors for the transaction of business unrestricted. It amplified and provided the detailed methods which at all times existed by implication prior to its enactment. Briefly, section 1 of this act provides that the banking department shall make an examination of any bank which contemplated reorganization and shall determine with the approval of the governor what can and should be required to be paid by the stockholders of said·bank, and that no waivers or depositors' agreements shall be taken until the amount so required shall have been paid in full by cash or other securities to be approved by the governor and the superintendent of banking. It is then provided by chapter 160, section 1 amending chapter 159, section 1, that:

"Any stockholder, or assignee of such holder, upon paying an amount equal to the sum so required, may present his certificate or certificates of stock to the superintendent of banking, who shall endorse thereon the amount so paid, and thereupon the holder of such stock, or those claiming by, through or under such holder by sale, transfer, assignment or otherwise, shall thereafter be released from any further liability, statutory or otherwise, on such stock or any reissue thereof, to the extent of the amount so paid and endorsed thereon."

It is then provided that before waivers or depositors' agreements are taken the superintendent of banking may authorize the

bank to set aside a percentage of its assets to be determined by him, and which may be regarded as slow or doubtful and to segregate the same.

"The superintendent of banking shall determine, with the approval of the governor, the percentage of deposits that may be waived and shall authorize the issuance of trust certificates in said bank to an amount equal to said assets so set aside and deposits waived and the delivery of such trust certificates to depositors whose deposits exceed ten dollars ($10.00) in such bank in proportion as their deposits are to such segregated assets and waived deposits. A dividend shall be declared at the end of each year covering the entire net earnings of the bank and the earnings of · and collections from the segregated assets, which dividend shall be applied pro rata to the payment of outstanding certificates of trust as herein provided, no dividends on any common stock in such bank shall be paid as long as any trust certificates are outstanding, unless otherwise agreed upon between such bank or trust company and a majority of the depositors holding direct, unsecured and unpreferred obligations of such bank in excess of ten dollars ($10.00) each, and totaling in the aggregate amount seventy-five per cent (75%) of the direct, unsecured and unpreferred obligations, and approved by the superintendent of banking. Such certificates shall be preferred in earnings and have preference in liquidation only over the common stock of said bank." Section 3.

"All trust certificates issued under the provisions of this act shall have preference and priority on all of the assets of the bank ahead of the rights of the holders of the common stock, and shall be paid in full before the common stockholders shall be entitled to any dividends or profits, * * * " Section 4.

"Where trust certificates are issued pursuant to section 3 of this act, the holders of such certificates in event of the distribution of assets of the bank, shall have a claim ahead of common stockholders or depositors against any assets of said bank which have been segregated for the protection of such trust certificates." Section 5.

Section 10 of this chapter provides:

"If a majority of the depositors, holding direct, unsecured and unpreferred obligations of such bank in excess of ten dollars ($10) each, and totaling in the aggregate amount seventy-five per cent

(75%) of the direct, unsecured and unpreferred obligations, shall agree to come within the provisions of this act by accepting trust certificates as herein provided, then, and in that event, all of the depositors of such bank are bound thereby."

These trust certificates may be retired pro rata through the earnings of and collections from the segregated assets and the net earnings of the bank. Section 12 provides:

"Until all trust certificates issued as provided herein, have been paid off and liquidated in full, no salary shall be paid to any officer, director, or employee unless first approved by the superintendent of banking and the governor of the state of Iowa, unless otherwise agreed upon between such bank or trust company and" the per cent of the depositors above referred to.

A law very similar to this statute was before the Supreme Court of the United States in the case of Doty v. Love, Superintendent of Banks of the State of Mississippi, supra. Justice Cardozo interpreted the Mississippi statute as being "liquidation by the bank itself, though in a reorganized form, is to be substituted for liquidation at the hands of a statutory receiver." The Mississippi statute was very similar to the Iowa law with reference to reorganization of banks with the exception that before any such reorganized bank could be reopened, the entire plan for the reopening of the same and all facts in connection therewith was required to be submitted by the superintendent of banks to the chancery court of the county in which the bank is situated, or to the chancellor in vacation, by proper petition, duly verified; such petition to contain a statement of the assets and liabilities of the bank and such other information as might be necessary to convey to the court or chancellor the true facts with reference to the condition of such bank, and a decree of the court or of the chancellor in vacation obtained approving the plan agreed upon for the reopening of such bank and authorizing the same to be reopened. There is no provision for notice upon anybody. In the Doty case notice was in fact given to about five thousand of the depositors. Our law designates the state superintendent of banking as the officer clothed with discretionary power to pass upon the matters which under the Mississippi statute are required to be passed upon by the court or the chancellor in vacation. The same attack was made upon the Mississippi statute as is

made in this case upon chapter 159. The Supreme Court of the United States upheld the law. The court says:

"All that the statute does upon its face is to change the method of liquidation. * * * Payment of the creditors is still the end to be attained, and resumption of business a means and nothing more. If debts are thereby swollen or assets made to shrink, the outcome is an unlooked-for incident of a method of administration conceived to be more efficient that present sale and distribution. The Constitution of the United States does not confer upon the depositors a vested right to liquidation at the hands of a state official."

In the Mississippi case they released 50 per cent of the stock liability, and this was upheld on the theory that the effect of the release was to make it possible for the bank to reopen with the result to the creditors of economies and other benefits that would otherwise be lost. It was the claim of the appellant in that case that the act destroyed his right of action against the stockholders, and objection was made thereto because it denied to the depositors due process of law and was an impairment of contract. There was a hearing on the merits in this case and the court bases its finding on the evidence introduced to the effect that the 50 per cent stock assessment that was collected under the new organization was of more benefit to the depositors than they would have obtained through forced liquidation, and the court concludes with this language:

"In such circumstances it is idle to speak of the release of liability as a gift or a sacrifice of valuable assets. The release was none of that, but a compromise of a liability of uncertain value upon terms beneficial to the creditors. * *· * The title to the extinguished cause of action was not in the depositors, but in the superintendent or the bank. If there had been no plan to reorganize, the superintendent like a receiver might have compromised the cause of action and released it with the approval of the court. His authority was no less because the release was incidental to a project to rehabilitate a business for the good of all concerned." ·

▉▉▉ The question of infringement because of the allowance in full of claims for $5 and under was likewise raised, and the Supreme Court of the United States says:

"The chancellor found by his decree that it would be more economical to pay these accounts in full than to incur the book-

keeping expenses incidental to a calculation of percentages whenever dividends were paid to others. * * * The objecting creditors have not been damaged by that feature of the plan."

The expenses incident to the distribution of the small claims is a fact of which this court can take judicial notice, and any regulation that would require the participation of every depositor, however small, in the plan of reorganization would be impractical and unreasonable. The question was also raised that the statute made no provision for notice to the depositors. The supreme court does not pass upon this phase of the case, but simply says:

"A sufficient answer is that the appellants appeared generally and were fully heard upon the merits."

The Supreme Court of Minnesota, passing on a similar law in the case of Hoff v. First State Bank, 174 Minn. 36, 218 N. W. 238, 240, held that the action of the commissioner of banks was not conclusive against nonassenting creditors, and that they might bring suit directly to recover their deposits, as the plaintiff did in that case, or, by any appropriate action, contest the validity of the act of the commissioner, and they refused to pass upon that question further because, except on constitutional grounds, no suggestion or claim was made that the reorganization agreement and proceedings were irregular or invalid, so that question was not presented, and on constitutional grounds the law was upheld. This is a well-considered case, from which we make the following pertinent quotations:

"The supervision and control of the state over the business of state banks, as well as over the liquidation of such banks, concerns a matter of vital public interest, and affects the public welfare. * * * A business in which the public has an interest or use and which affects the public welfare is subject to regulation by statute. * * * When a business is affected with a public interest, it ceases to be exclusively private, and becomes subject to regulation by law in the interest of public welfare. * * * Whatever may have been the status of banks in ages past, when but few people had money therein, the use of banks has now become so general and necessary that they have practically become public-institutions. * * * So

the business of banking is clearly affected with a public interest, and subject to reasonable statutory regulations. * * *

"The power to regulate flows from the facts that the business is affected with a vital public interest, and that public welfare justifies and requires regulation and restriction thereof. * * * The commissioner of banks, the same as the comptroller [under federal statute], when he has taken over an insolvent state bank, represents and acts for the bank and its stockholders and creditors as well. He is a state officer designated for such purposes. * * * The commissioner, when he approves a reorganization agreement, is so acting for the bank and its stockholders and creditors. He is presumed to be an impartial agent for that purpose, and to act fairly, impartially, and justly. The prescribed petition being presented and acted upon by him, his action should be binding upon all creditors, unless shown to be, and set aside as, arbitrary, unjust, or fraudulent."

Until some showing is made to the contrary, the actions of the superintendent of banking and other public officials in connection with the reorganization of said bank are presumed to be regular, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties. United States v. Chemical Foundation, 272 U. S. 1, 47 S. Ct. 1, 71 L. Ed. 131, at page 142. Under this presumption, it will be taken that the superintendent acted upon knowledge of all the material facts. Likewise, it will be presumed that the superintendent of banking had knowledge of the material facts, and that he acted in the light of such facts. He represented the bank, the stockholders, and creditors, and is presumed to have acted impartially until it is shown to the contrary. There is no claim by the plaintiff that she was not fully apprised of the proposed and final reorganization of the bank. She was solicited to join with the other depositors. Under such circumstances, unless the rules and regulations and plans promulgated by this statute are so clearly unreasonable and without substantial relation to the public interest, and constitute a clear and unmistakable infringement of some constitutional guaranty, the law must be upheld. Must the government, in its sovereign power, faced with a crisis such as that confronting the legislature at the time this act was passed, vitally affecting practically every member of every household in every city and hamlet within the borders of the state, sit supinely by, and watch the avalanche descend upon

the people, like the lava from old Vesuvius upon the helpless inhabitants of ancient Pompeii? To do so would be to invite revolution and a reign of terror. There is nothing so sure to overthrow a government as inaction, want of leadership, and apathy toward the interests of the public, when faced with a condition such as existed throughout this state at that time.

The action of the superintendent of banking, of course, is not a finality. He is an administrative officer. The court of chancery is at all times open to any interested party to test the legality of his acts, to inquire into the fairness and regularity thereof, and to prevent unreasonable and arbitrary action on his part, and the court will inquire into all such matters in a proper case by an interested party whose rights have been unduly interfered with to his injury. That a court of equity would interfere by injunctive process to prevent arbitrary action of an administrative officer in the discharge of his duties is elementary. See Commonwealth v. Hargis Bank & Trust Co., supra; Doty v. Love, supra, wherein Justice Cardozo said:

"The jurisdiction of the court of chancery to give approval to a settlement by a receiver or other officer did not have its genesis in the act of 1932 or in the procedure there prescribed. It existed in like measure when the liquidation of this bank was begun in 1930 and for many years before. Depositors were chargeable with notice of that power and became subject to its exercise in making their deposits."

This court held in the case of Loftus v. Department of Agriculture, supra, that notwithstanding the fact that the agent of the government could go upon a man's premises and test his cattle, nevertheless, the owner of the cattle is guaranteed a hearing to determine whether the animals are infected with tuberculosis.

"Events may demand that such hearing be after, rather than before, the condemnation and destruction. Yet the remedy is present all the time. Consequently, due process of law is guaranteed even though the state agents may, perchance, step beyond the realm of the police power, for, if such state representatives destroy healthy cattle, the owner may recover damages for the loss thereof. * * * Therefore, the statute under consideration is not arbitrary or unreasonable, and it does not deny appellees due process of law in this regard."

■ Neither is the due process clause violated because discretionary power is vested in an administrative officer. "Administrative officers may, within proper limitations, exercise discretion, find facts, and exercise judgment. * * * Boards exercising administrative functions may promulgate and adopt rules and regulations." See cases cited in Loftus v. Department of Agriculture, supra, page 583.

As said in Abbott v. Morris, 101 W. Va. 127, 132 S. E. 372, 373, in upholding the authority of the state banking commissioner, with the consent of the governor, to appoint a receiver to take charge of an insolvent bank to the exclusion of any court-appointed receiver:

"The business of banking is so intimately interwoven with the business of the state that public welfare demands that it should be supervised, visited, examined, controlled, and liquidated, if need be, by experts. The exercise of such power by the legislature is dictated and warranted by sound public policy."

The Supreme Court of Nevada in State ex rel. Howell v. Wildes, 34 Nev. 94, 116 P. 595, 600, said:

"The legislature may, within its police power, regulate and control banks, and it may be that the police power is extensive enough to authorize the seizure of such bank by a bank examiner upon his judgment, or that of a commission, that the bank is insolvent, and, without a hearing and a determination in advance by a court, authorize him to proceed to liquidate its affairs, subject to the right of an appeal to the courts by the bank's officers or other parties in interest."

However, the court further said: "It is conceded that this assumed power, yet to be determined, could not be exercised, even under the police power, so as to cut off the interposition of the courts to determine the question of the bank's right to continue its business."

In some of the states having a law similar to ours, there is a further provision in the statute that the powers of the superintendent of banking shall be the same as those of a receiver.

A law similar in many respects to the provisions of our statute was considered in the case of Robinson et al v. Peoples Bank of Leslie (Mich.) supra. The Michigan law permits the banking com-

missioner with the consent of the governor to take over as conservator the custody and management of banks under certain conditions. He may continue to operate it in what he believes to be the best interests of the depositors, creditors, borrowers, and all other parties in interest, and if, through the efforts of its officers, directors, or stockholders, it is able to so adjust its affairs that it can reopen and continue its business with safety, dissolution will not be required. During this period no proceedings in court are provided for. He is given power in case he decides to wind up the affairs of the bank to appoint a receiver for that purpose, and the receiver shall proceed to close up such bank or trust company, and enforce the statutory liability of the stockholders. And it was held that it was not a violation of the constitutional provision in taking property without due process of law.

Again, in the case of Jeffries v. Bacastow, 90 Kan. 495, 135 P. 582, 583, the court said:

"Before insolvency the management of a bank is placed by law in the hands of a body of men, created by statute, designated a board of directors, who act under the supervision and in many respects under the control of the bank commissioner. After insolvency, *and in certain other contingencies,* this management is exercised by a single official chosen by the bank commissioner, who is called, for convenience and by analogy, a receiver." (Italics ours.) "The state in the exercise of its police power controls the business of banking in the interest of the public welfare, and interferes, now to a less and now to a greater extent, as conditions may warrant. By investigation or by other means the bank commissioner discovers certain things which constitute insolvency or other ground for winding up the affairs of the bank. His finding of fact is no more adjudication than the conclusion he reaches that available funds are below the lawful reserve, which must be made good, that an excessive loan must be reduced, or that capital stock has been impaired. The fact of insolvency having been discovered, the statute directs the bank commissioner's course, and the designation by him of a person to wind up the affairs of the bank is no more a judicial act than his order to the board of directors to remove a dishonest cashier. His powers are purely administrative, and in no way infringe upon the ancient authority of courts to determine rights of person and property in specific controversies pending before them."

The state of Florida has a similar statute which was upheld by the supreme court of that state, in the case of McConville v. Ft. Pierce Bank & Trust Co., 101 Fla. 727, 135 So. 392, 395. This case lays down some pertinent general rules of construction, applicable to the present controversy:

"The general rule seems to be that where administrative orders are issued under statutory authority by the officer having direct supervision of such administrative department, they are deemed to be prima facie reasonable and just. See Amos v. Conkling, 99 Fla. 206, 126 So. 283; State v. Florida East Coast R. Co., 64 Fla. 112, 59 So. 385; 22 R. C. L. 491, par. 171; United States v. Chemical Foundation, 272 U. S. 1, 47 S. Ct. 1, 71 L. Ed. 131. It has been well said that it must be presumed that the legislature has considered and discussed the constitutionality of all measures passed by it. 1 Lewis' Sutherland, Statutory Construction (2d Ed.) par. 82."

In that case the same question was raised—that it impaired the obligation of contracts. The law provided that pending the possession of the bank by the comptroller and until the affairs are placed in a sound and safe condition or a receiver is placed in control, "all the remedies at law or in equity of any creditor or stockholder against any such bank, banking company or banker shall be suspended." The court said:

"It is well established that all contracts are inherently subject to the paramount powers of the sovereign and the exercise of such power is never understood to involve their violation. The statute here involved is not within the provision of the constitution forbidding a state to pass laws impairing the obligation of contracts. See Osborn v. Nicholson, 13 Wall. 654, 20 L. Ed. 689, and cases cited. * * *

"Banks have become indispensable agencies through which industry, trade, and commerce are carried on; and while they exist mainly for private profit, it cannot be denied that they are preeminently of a public nature and therefore universally recognized as a corporation of a quasi-public nature and subject to statutory regulation for the protection of the public. See 3 R. C. L. 379, 5; Noble State Bank v. Haskell, 219 U. S. 104, 31 S. Ct. 186, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487; Id., 219 U. S. 575, 31 S. Ct. 299, 55 L. Ed. 341; Bryan v. Bullock, 84 Fla. 179, 93 So. 182."

On the question of the binding of the minority of the depositors who would not sign what is termed an agreement to "freeze" the deposits, the court said:

"This may be a new question so far as state banks are concerned; however, it cannot be seriously contended that depositors may not apply the composition agreement plan heretofore recognized and applied to other creditors of bankrupts, inasmuch as the federal Bankruptcy Act (11 USCA) does not apply to state banks where state statutes are in force. In the case of Merchants Bank of Mobile v. Zadek, 203 Ala. 518, 84 So. 715, it is stated that an agreement of composition under the Bankruptcy Act entered into by the required number of creditors will be binding upon all, for each has the agreement of the others as a consideration for his own engagement, and the effect is to treat all creditors as a class and to enforce the will of the majority upon the minority. See Cumberland Glass Mfg. Co. v. DeWitt, 237 U. S. 447, 35 S. Ct. 636, 59 L. Ed. 1042. See, also, 3 R. C. L. 306, par. 130 et seq.

"Chapter 11849, Acts of 1927, undertakes to apply the principles of composition of creditors as used in the federal Bankruptcy Act to state banks in order that all depositors of banks should be treated as a class, upon the theory that that which is for the best interest of a class as a whole may properly be imposed by the comptroller as one of the conditions for the reopening of the bank. It is seen therefore that the statute under consideration does not impair the obligation of contracts, nor deprive the objecting depositor of the equal protection of the law. Farmers & Merchants Bank of Monroe v. Federal Reserve Bank, 262 U. S. 649, 43 S. Ct. 651, 67 L. Ed. 1157, 30 A. L. R. 635."

The matter in this case arose on demurrer and the court held that the terms of the freezing order, and its reasonableness, were not subject to a proper adjudication by means of a demurrer to the plea.

■ The idea of requiring the minority to submit to the wish of the majority is borrowed from the provisions of the Bankruptcy Act (11 USCA) providing for a composition of creditors. See Cumberland Glass Mfg. Co. v. DeWitt, supra. In that case, however, the composition is required to be submitted to the court for the reason that the bankrupt is not submitting all his property, but is bargaining with his creditors, and the approval of the court is

necessary, while under the Banking Act the assets are in no way impaired or depleted. The dissenting creditor gets exactly as much as the assenting creditor. He is, therefore, not harmed. There is no taking of the property of one and giving it to another in this case. There is no change in the relationship of this plaintiff as a depositor-creditor which does not apply equally to all other depositors in the same class. Nothing was added to the assets in which the depositors who signed the agreement participated, and nothing was taken away from the assets in which this plaintiff was permitted to participate. The loss in value of the assets, whether due to financial depression or other causes, affected the assets of all depositors. Had something been taken away or the fund depleted to the special prejudice of plaintiff as compared with other creditors of the same class, a different question would be presented. Plaintiff is the one who is seeking to take away from others more than her pro rata share. Plaintiff is making no attempt to show that she would get more through total winding up of the affairs of the bank. She is content to let the reorganization stand, but she does not want to be bound to take her pay for the trusteed deposit out of the shrunken assets, to which has been added by means of net earnings the equivalent of a 100 per cent assessment against the stockholders. She seeks to take advantage of her failure and refusal to cooperate in an effort to rehabilitate and conserve the assets until better prices enable the trustees to make collections.

It will thus be seen that in the composition of creditors under the bankrupt law, all the assets of the bankrupt are not available to the creditors, while in the composition under the banking law, whereby the majority binds the minority, there is no curtailment of the assets available for the payment of depositors' claims. The assets are all preserved. There is no curtailment of the assets of the bank or the statutory liability against the holders of the capital stock of said bank.

As to binding all of the parties, the Court of Appeals of New York in the case of In re Title & Mortgage Guarantee Company of Buffalo, 264 N. Y. 69, 190 N. E. 153, 96 A. L. R. 297, had before it a similar proposition. The law there enacted provided that, when a certain number entered into a plan for the readjustment, modification or reorganization of the rights of the holders of real estate, mortgage bonds, and securities, that it should be binding upon all,

and as to the constitutionality of this law, Justice Lehman said, 264 N. Y. 69, supra, at page 93:

"We may assume that, except for this statute, a certificate holder might stand upon his contractual rights and refuse to accede to any plan of reorganization of the rights of the holders of the mortgage investment, however advantageous the plan of reorganization might be. We may even assume that the legislature could not pass a law which would compel a single holder to accede to such a plan, though approved by the court and consented to by a majority in amount of all the holders of interest in an investment, *if only the rights of the parties to the contract were involved.* Here, as we have said, much more is involved. Unreasonable insistence on contractual rights may work serious injury to the economic welfare of all the people. The statute must be judged in the light of that fact. Under conditions as they exist at present, the vital interests of the community call for legislation by which the investments of great numbers of people may be conserved and ruin averted. The legislature has characterized the situation as a 'public emergency.' It is immaterial whether we call the situation an emergency or not. * * * Whether an emergency exists or not, *the test* in each case is whether a situation exists which calls for the *exercise* of the *reserved power of the state* and whether the remedy adopted by the state is *reasonable and legitimate.* * * *

"Here the legislature has not attempted to change the relative situation of debtors and creditors or provided that any obligation of a contract shall be impaired without the consent of two-thirds in amount of the holders of an interest in such obligations. Performance by the debtor according to the letter of the bond may be demanded unless holders in that amount consent to its postponement or alteration. The statute is directed solely towards facilitating agreement among such holders in a plan which will be fair to all and to prevent unreasonable insistence upon the letter of the obligation of contracts when, under changed conditions, such insistence might work injury both to individuals similarly situated and to the community. It gives, indeed, to the creditors as a group a remedy which they did not have before; *it deprives no one of a remedy which he would use for his legitimate benefit or without injury to others.*"

A law similar to the one herein involved was before the Wisconsin supreme court in the case of Wausau Malt Products Co. v. Citizens State Bank of Wausau, 214 Wis. 654, 254 N. W. page 379, 380, 95 A. L. R. 1210. The lower court found for the plaintiff. Upon appeal, the supreme court found that the plaintiff's deposit in that case was made subsequent to the enactment of the statute under consideration. The action was brought before the requisite number of signers had been obtained. The court seems to base its holding on the fact that the law being in force, the deposit was made in pursuance of the provisions of the statute, and that the statute did not impair the obligation of plaintiff's contract, and that no serious question of constitutional law was involved. The court uses this language:

"The character of banking as an institution peculiarly calling for regulation and for the exercise of the police power in order to give adequate protection to the public is too well established to call for extended comment. McConville v. Ft. Pierce Bk. & Tr. Co., 101 Fla. 727, 135 So. 392; Noble State Bank v. Haskell, 219 U. S. 104, 31 S. Ct. 186, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487; Re Opinion of Justices, 278 Mass. 607, 181 N. E. 833, 82 A. L. R. 1021."

The court further says:

"The purpose of the statute, and its clear intent, is that the rights of depositors who are subject to the law to prosecute actions upon their deposits are entirely contingent upon the successful completion of the stabilization agreement [provided by the statute]. If and when that agreement goes into force and effect, it terminates ab initio the right of a depositor to prosecute an action based upon the withholding of his deposit. This violates no constitutional right of any depositor situated as was the plaintiff. Plaintiff made its deposits after the law was passed, and was subject to its provisions. Its contract must be assumed to have as a part of it the understanding that its right to claim its entire deposit in preference to other depositors is subject to being defeated ab initio by the completion of a stabilization agreement, and that this is true no matter at what stage of enforcement its cause of action is. Its success in this action makes it only a judgment creditor of the bank. Its rights as a depositor are merged in the judgment, but this does not prevent the court from perceiving that the basis of the judg-

ment is a claim as a depositor which is subject to the stabilization agreement."

In a recent case in the supreme court of Mississippi, Dunn v. Love, reported in 155 So. 331, 333, 92 A. L. R. 1323, a similar statute was under investigation, and in that case the supreme court of Mississippi, by a divided court, held the law valid. In that case, however, the bank was in receivership, and the liquidation proceedings and plan for reorganization was during the time the bank was in receivership. The court uses the following language:

"This statute, remedial in its nature and operation, is one among a number of legislative acts devised in the attempt to meet, so far as practicable, the unusual conditions brought about by the present economic depression, the most serious within the present generation, and in the effort to salvage something in the general wreck of things. In considering legislative and administrative efforts at salvage and rehabilitation, in the distressing situation with which the country has been and is yet confronted, we must not permit ourselves to be maneuvered into positions which would view the federal and state constitutions as sculptured idols, frowning with changeless features upon a changing world; for the true view, as was said by this court in City of Jackson v. Deposit Bank, 160 Miss. 752, 768, 133 So. 195, 198, is that 'the interpretation of constitutional principles must not be too literal. We must remember that the machinery of government would not work if it were not allowed a little play in its joints,' an expression taken from an opinion of the supreme court of the United States in Bain Co. v. Pinson, 282 U. S. 499, 51 S. Ct. 228, 75 L. Ed. 482. When examined in the light of this principle of constitutional interpretation, we can find nothing in the general purpose and scope of the statute which is prohibited either by the state or the federal constitution, in which connection we may observe that similar statutes have been under review in other states, and their supreme courts have upheld them in every case which has been brought to our attention. As typical of these cases, we may cite McConville v. Fort Pierce Bank, 101 Fla. 727, 135 So. 392, and Milner v. Gibson, 249 Ky. 594, 61 S. W. (2d) 273."

Further, the court says:

"At the same time the depositor, when becoming such creditor, knew that this contract was one made not only as a part of the

existing laws providing for the administration of that liability in favor of all depositors, and ratably among them by state agencies designated by law for that purpose, *but also that the contract so made and the liability so incurred was one subject to subsequent laws reasonably enacted or to be enacted under the sovereign power of the state to legislate and to administer in the vital interest of the general welfare.*" Citing, Christensen v. Merchants Bank [168 Miss. 43] 150 So. 375; Love v. Mangum, 160 Miss. 590, 597, 135 So. 223; Home Bldg. Assn. v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481." (Italics ours.)

It is further laid down in this case that:

"In considering the constitutional guaranty against impairment of contract, courts now definitely look to substance rather than to form; realization upon the value or worth of the contract is the concern of the guaranty, not that any particular method for that realization shall be observed or preserved; * * * that unless the complaining depositor can show that he has been substantially injured in ultimate results, has in fact been actually hurt by the reorganization and the plan thereof, he has no right to complain whether upon constitutional or statutory or administrative grounds."

See, also, Gibbes v. Zimmerman (S. C.) 290 U. S. 326, 54 S. Ct. 140, 78 L. Ed. 342.

This court said in Fevold v. Board of Supervisors, 202 Iowa 1019, at page 1026, 210 N. W. 139, 142:

"Neither the Fourteenth Amendment nor any other amendment, was designed to interfere with the police power of the state to prescribe regulations to promote the health, peace, morals, education, and good order of the people."

In the case of Peverill v. Board of Supervisors, 208 Iowa 94, at page 106, 222 N. W. 535, 541, opinion by Justice Albert, this court again said:

"If the legislature, in enacting this law [bovine tuberculosis law], was exercising its rights under the police power, then it could, if it so elected, authorize the testing of these cattle and the destruction of those found infected, without notice and hearing, and without even providing compensation therefor. That laws of this character have been held by this court and other courts to come within the purview of the police power is now settled."

In that case it was the contention that due process of law requires a hearing and notice of a hearing; that this is true even though the proceedings are clearly within and authorized by the police power. The matter was put squarely up to the court, and this court said:

"This presents the question of where the legislature enacts a statute under the police power, and whether, in so doing, it is bound by the rule of due process to the extent of requiring the provisions for notice and opportunity to be heard.

"The contention of the appellant is that the statute is unconstitutional in that it violates due process of law, independent of the question of whether the statute was enacted under the exercise of the police power. With this we cannot quite agree. The question rather is, stated in a simple form, Is the due process rule a limitation on the right to exercise the police power?

"The due process rule is not confined alone to our system of jurisprudence, but is common to thoughtful men everywhere. The heart of it lies in the thought that a right to present defenses must precede judgment; and, necessarily involved therein, the right of notice and opportunity to be heard is the very foundation of the doctrine. As heretofore noted, the law as it existed at the time of the action of the secretary of agriculture in declaring Black Hawk county to be an accredited area, made no provision whatever for notice and opportunity to be heard, as to those parties who had not signed agreements, with the secretary of agriculture, as provided by the statute. This, of course, *prima facie*, was not due process of law as to them. The question is, Does this failure to observe due process of law in this respect make this statute unconstitutional, where the statute, as it is in this case, was enacted under the exercise of the police power?"

The opinion then reviews our former pronouncements and those of the United States supreme court on this subject, and finally concludes:

"The conclusion we draw from this review of the decisions of the supreme court of the United States is that the due-process rule is not a limitation upon the right of the state to exercise its police power unless the attempted exercise of such power is arbitrary or unreasonable or an improper use of such power. This seems to be the necessary conclusion from these cases.

"Turning now to the instant case, we find nothing to sustain the contention that the exercise of the police power of this state, by reason of the enactments herein referred to, is arbitrary or unreasonable. Since we hold that the state of Iowa properly exercised its police power in enacting these statutes, it necessarily follows that the due-process clause of the Fourteenth Amendment of the Constitution of the United States does not restrict or limit the right of the state to exercise its police power as it did. In short, when the legislature, within proper bounds, exercises its police power, the due-process clause of the Fourteenth Amendment of the Constitution of the United States does not operate."

Summarized, it is the holding of this court that the exigencies of the occasion were such as to call forth the reserve power of the state at the time of the enactment of Senate File No. 111 (chapter 156) and Senate File No. 483 (chapter 159); that such legislation was remedial in its nature and pertained to a matter vitally affecting the general public interest; that such legislation is "addressed to a legitimate end and the measures taken were appropriate to that end"; that the plaintiff and all other depositors were chargeable with notice of the existing laws, and likewise with the sovereign power of the state to enact additional remedial measures such as these, and that depositors became subject to the exercise of that power in making their deposits; and that such laws are not in contravention of article I, section 10 of the Constitution of the United States, nor of article I, section 21, of the Constitution of the state of Iowa, prohibiting the enactment of any law "impairing the obligation of contracts," nor in violation of the due process clause of section 1 of the Fourteenth Amendment to the federal constitution. It therefore follows that the order of the trial court in overruling plaintiff's motion to strike must be, and it is hereby, affirmed.—Affirmed.

ANDERSON, C. J., and ALBERT, KINTZINGER, DONEGAN, and RICHARDS, JJ., concurring.

MITCHELL and PARSONS, JJ., take no part.